**In the Matter of UNITED STATES of America, Petitioner,**
**No. 5755, Original.**

United States Court of Appeals
First Circuit.
Feb. 2, 1961.

Elliot L. Richardson, U. S. Atty., Boston, Mass., with whom George C. Caner, Jr., and Joseph S. Mitchell, Jr., Asst. U. S. Attys. were on brief, for petitioner.

James D. St. Clair, Boston, Mass., with whom Blair L. Perry and Hale & Dorr, Boston, Mass., were on brief, for Standard Coil Products Co., Inc., intervenor.

Samuel E. Angoff, Boston, Mass., with whom Grant, Angoff, Goldman & Manning, Boston, Mass., was on brief, for Robert Knupp and Fong Foo, intervenors.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This is a petition by the United States for a writ of mandamus directing a judge of the United States District Court for the District of Massachusetts, and also that District Court, to vacate a "Judgment of Acquittal" entered by the judge in a criminal case, to reassign the case for trial, and for such other and further relief as this court may deem just.

A grand jury in the court below returned an indictment in nine counts against Standard Coil Products Co., Inc.,

an Illinois corporation, which at the time covered by the indictment had a manufacturing plant in North Dighton, Massachusetts, and two individuals then employed by it at that plant, one as the Chief of its Quality Control Department and the other at first as a supervisor and later as the foreman in charge of the production of certain electronic instruments to be described presently, charging all three with the offenses of concealing material facts and conspiring to conceal material facts in a matter within the jurisdiction of an agency of the United States in violation of Title 18 U.S.C. § 1001 and § 371. More specifically the charges were that from September 1956 to November 1957 the accused had knowingly and wilfully falsified, and conspired between themselves and with others to falsify, tests of radiosondes [1] being manufactured at the time in the plant at North Dighton under two contracts entered into by Standard Coil Products Co., Inc., with the Army Signal Supply Agency.

Motions to dismiss the indictment were denied and the defendants were set to the bar to be tried by jury on their pleas of not guilty.

One of the two Assistant United States Attorneys who represented the Government at the trial made an opening statement to the jury in which he explained the general nature of the charges laid in the indictment and the evidence he proposed to introduce saying that the presentation of the Government's case would fall naturally into two parts, the first part consisting of evidence explanatory of the instruments and of the procedures for testing them and the second part consisting of evidence of deliberate and conniving falsification of the tests run on the instruments by the defendants. In carrying out this program the Assistant United States Attorney in charge at the trial called a witness through whom he introduced the contracts and related documents under which the radiosondes were manufactured by Standard Coil Products Co., Inc. He then called the "Quality Assurance Representative" of the Army Signal Supply Agency who had been stationed at the corporate defendant's North Dighton plant during the time involved for the purpose of supervising the inspection of radiosondes by plant personnel. An examination of the record shows that while this witness was on direct examination he was asked fully as many questions by the judge as by the Assistant United States Attorney. Moreover, the judge on several occasions, both during direct and cross-examination, ridiculed the witness with respect to his use of words, repeatedly corrected his grammar, and many times admonished him to remember that he should be careful in his statements since he was testifying in a criminal case. As the examination of this witness proceeded the questions and sometimes sharp comments of the judge clearly show that he considered the witness's testimony unworthy of belief.

The Assistant United States Attorney next called a witness who briefly identified certain charts to be used by subsequent witnesses as "chalks" and then called a witness to the stand who identified himself as having been the "final inspector of radiosondes" employed by the corporate defendant at its North Dighton plant during the period covered by the indictment.

The direct examination of this witness closely followed the pattern of the direct examination of the government inspector. Toward the end of a day, while still on direct examination, this witness was asked for the date of a conference he had been invited to attend at the plant office with counsel for the corporate defendant. He said at first that he did not remember the date but when pressed for his best recollection he said that he thought the meeting was early in 1958, he believed

---

1. These are electronic devices for furnishing weather data designed to be dropped from airplanes in remote places and while floating to earth by parachute to transmit continuous radio signals in Morse Code indicating the temperature, pressure and humidity of the air through which they pass.

in February but was not sure. That is to say, he put the date of the conference after the period covered by the indictment. The next morning, while still on direct examination, the witness was again asked if he was certain of the date of the conference and he again said he was not. On being asked once more for his best recollection he said, "Approximately September 1957." The judge then asked the witness if he had talked with government counsel while testifying in the case, and the witness saying that he had, the judge remarked that in a criminal case that was not "correct."

A little while later, on cross-examination by counsel for the corporate defendant, the witness admitted that he had changed his testimony as to the date of the meeting as a result of a conference with one of the Assistant United States Attorneys during the preceding overnight recess. The judge then excused the jury and asked the Assistant United States Attorney involved if he wished to make any statement "as a matter of personal privilege." The latter answered that he was unaware of any reason why he should not talk with his own witness during a recess called in the course of the witness's direct examination and expressed astonishment that the judge should think that there was any impropriety in his having done so. The judge then ordered the witness to leave the courtroom and the Assistant United States Attorney, again having expressed ignorance of any impropriety in what he had done, the judge said, "You will very soon learn," and addressed the Assistant United States Attorney as follows:

"You were here and you knew he was on the stand. You knew there was a recess. You know the principle that a witness must be examined in public. You know that, without suggesting for a moment that you offered any improper inducement, tampering with a witness is one of the most dangerous things in connection with a case, and particularly a criminal case, that a person should be left entirely alone during the course of his testimony. You must know that elementary fact and elementary rule."

During further colloquy in the same vein the judge said that he did not mean that counsel for the Government were "personally deliberately" doing something they "knew to be wicked," and that he was not "proposing to take any disciplinary action" against them but was only interested in finding out whether the "situation" was one in which he "must respond to a motion." After more colloquy in the course of which the judge again suggested that the "situation" might require him to act "in response to a motion," counsel for each defendant moved orally for judgment of acquittal. Counsel for the Government strenuously opposed these motions on the ground that the witnesses so far heard were not vital to the case but were primarily intended only to lay the basis for concrete testimony of guilt to follow and that there were many government witnesses in attendance in the courtroom yet to be heard for whose credibility he was ready to vouch. He suggested that the most that should be done would be to strike the testimony of the witness under examination.

At the conclusion of the Assistant United States Attorney's remarks the judge recalled the jury, ordered the witness back to the stand, and opened a statement to the jury as follows:

"Mr. Foreman and Members of the Jury, before I say anything else, let me make it absolutely clear that counsel for the defendants as well as the Court are persuaded that neither the United States Attorney [2] nor either of his assistants consciously or deliberately violated any canon with which they were familiar. They were acting subjectively in good faith, and I do not mean at any stage of the remarks I am about to

---

2. The United States Attorney himself had joined his two assistants in the courtroom during the course of the trial.

make to criticize them in the sense that I believe that they were conscious wrongdoers."

Following this the judge implied that he considered the Assistant United States Attorney's conference with the witness during recess a serious infringement of the defendants' civil rights and that he regarded the testimony of the two principal witnesses so far produced by the Government to be wholly unworthy of belief, saying that both showed on the stand "a lamentable lack of awareness or lack of capacity in connection with their testimonial obligations" and that the witness then on the stand "has shown either lamentable lack of memory or an extraordinary power of inventiveness."

At the conclusion of his remarks the judge said to the jury that acting in response to the motions for acquittal made by counsel for the individual defendants and the corporate defendant, "I direct you at this stage to return verdicts of acquittal with respect to each of the individuals and with respect to the corporation." The judge then directed the defendants to stand up and announced, "You have been acquitted by direction of the Court and by the Court. Your bail is terminated. You are free."[3]

We cannot be sure whether the judge directed acquittal of the defendants because he thought the testimony of two of the four witnesses put on by the United States at the outset of the trial was not entitled to belief or because he thought the action of the Assistant United States Attorney in talking with a government witness during a recess called while the witness was on direct examination deprived the defendants of some basic civil right. But whether the judge acted as he did for one reason or for the other, or for both reasons in combination, we think his action was not only plainly erroneous but beyond his jurisdiction.

The testimony of the two principal witnesses to whom we have specifically referred was certainly confused and conflicting. But, although to an appellate court the record of a trial may be "cold," it can nevertheless be clear; and it is clear from the record before us that the confusion and conflicts in these witnesses' testimony was due in no minor part to the trial judge's persistent, sharp and sometimes caustic cross-examination throughout their direct examination.

It is evident that the memories of the Government's witnesses were not entirely reliable, particularly as to details and it is also evident that they were not masters of the English language. But as every lawyer with trial experience knows, the witness whose memory is clear and sharp, who in court is neither over-awed nor cockily over-confident, and who has the capacity clearly to understand the questions asked and the command of language to answer briefly and accurately is indeed a *rara avis*. Cases can only be tried on the testimony of those who have knowledge of the issues, whoever they may happen to be, and all too often, indeed usually, witnesses, coming as they ordinarily do from the body of the general public, neither think nor speak with the clarity and precision of academicians. For the most part witnesses with only average education and intellectual capacity are the tools with which trial counsel must work as best they can. Moreover, every occupation has its own vernacular. Sailors, doctors, railroad men, engineers, not to omit lawyers, and others too numerous to mention, more or less uncon-

3. On the next day judgment was entered as follows:

"The Defendants, Standard Coil Products Co., Inc., Fong Foo, and Robert Knupp, having been set to the bar to be tried by a jury for the offenses of concealment of material facts and conspiring to conceal material facts in a matter within the jurisdiction of an agency of the United States in violation of 18 U.S.C. 1001 and 371 as charged in 9 counts, and

"On September 20, 1960, upon the allowance of motions for acquittal made on behalf of each defendant, it is

"Ordered that each defendant be, and hereby is, acquitted of the offenses charged, and it is

"Further Ordered that each defendant be, and hereby is, discharged."

sciously slip into the vocabularies of their callings. Naturally witnesses can and should be required to explain the words they use. It is hardly necessary, however, to do so with ridicule or caustic criticism, or repeatedly to check a witness's use of words in reasonably common use by reference to the Oxford English Dictionary, or to require strict adherence to the rules of grammar. The bench is not an appropriate rostrum from which to teach the niceties of English grammar and usage.

It may well be that solicitude for the essential rights of an accused requires the trial judge to cross-examine government witnesses when an accused with no capacity to protect his rights insists upon conducting his own defense or when an accused is represented by wholly inadequate counsel. No such situation is before us here, however, for the accused were skillfully represented by able and experienced trial counsel who were very well qualified to preserve their client's every interest. We think it would have been far better had performance of that function been left to counsel. Trial judges must not forget that questions from the bench naturally and properly fall with great impact upon ordinary witnesses and that counsel are reluctant to object to questions asked by a judge for fear of giving offense. There can be no even give and take in court between the judge and counsel for counsel on the floor do not stand on even terms with the judge on the bench.

While performance by the trial judge of his function, indeed duty, to see that the truth is elicited ordinarily requires clarifying questions from the bench, and maybe on occasion sharp warnings, it is not his function or duty to take the conduct of a case away from counsel. Counsel, as in this case, who sees the examination of his witnesses taken over by the judge and led into matters the witnesses were not intended to cover in their testimony and so opened for cross-examination as to those matters by the other side, finds himself in a most difficult and embarrassing situation.

In the first place, it is a delicate matter about which counsel think twice to object to any question asked by a judge. In the second place, if counsel objects to a judge's question on the ground that it leads the witness into matters he was not offered to testify about, counsel runs the risk, exemplified in this case, of comment by the judge before the jury implying that he is seeking to cut off legitimate inquiry. On the other hand, if counsel does not object he soons finds his witness floundering and displaying ignorance and, again as in this case, provoking critical comments by the judge either on the witness's intelligence or on counsel's failure to prepare his case.

We recognize that in the federal courts the trial judge is not relegated to the position of a mere moderator. He has the duty not only to make rulings of law but also to govern the trial to assure its proper conduct. Quercia v. United States, 1933, 289 U.S. 466, 469, 53 S.Ct. 698, 289 L.Ed. 1321. Moreover upon his shoulders rests the duty to see that the trial is conducted with solicitude for the basic and essential rights of the accused. Glasser v. United States, 1942, 315 U.S. 60, 71, 62 S.Ct. 457, 86 L.Ed. 680. But when the trial judge assumes the role of counsel the adversary system breaks down into confusion worse confounded as the record in this case clearly shows.

This record provides a prime example of the consequences of overzealous participation in the examination of witnesses by the trial judge, for it is clear that the judge's sharp persistent, sometimes almost badgering, questioning and caustic remarks first made the witnesses wary and overcautious and then confused them into inconsistencies, and in addition disrupted the orderly presentation of the Government's case according to the plan outlined to the jury by the Assistant United States Attorney by taking its witnesses into matters they were not offered to cover in their testimony. Running cross-examination from the bench, particularly during a witness's direct examination, is an innovation in trial

practice which definitely does not have the approval of this court.[4]

■ We are at a loss to understand the basis for the judge's criticism of the Assistant United States Attorney for talking with a Government witness during a recess. We are not aware of any rule of law, "elementary" or otherwise, or any canon of professional conduct forbidding the practice. Of course, as a matter of trial tactics, counsel ordinarily avoid talking with a witness during a recess called while the witness is on the stand so as not to provide opposing counsel with a point to argue to the jury. But tactics are one thing and rules of law and canons of ethics are quite another. There is nothing wrong that we know of in talking with a witness during intervals in his examination in court. Indeed in Frazer v. United States, 9 Cir., 1956, 233 F.2d 1, 2, counsel for the Government was commended for privately reminding a witness of a false statement in her testimony thereby causing her to change her testimony to conform to the truth.

The Assistant United States Attorney was not guilty of any misconduct or impropriety, and even if he had been it would seem that the most the defendants would be entitled to would be an order of mistrial.[5] Berger v. United States, 1935, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. Moreover, the judge should have allowed the jury to pass on the credibility of the Government's introductory witnesses and allowed the Government to proceed with the presentation of its concrete evidence of the offenses charged. The question remains as to what, if anything, this court can and should do to correct the trial judge's error.

■■ Certainly the judge's error was prejudicial to the United States. But the United States obviously cannot appeal. Nor may it resort to mandamus as a substitute for appeal. The writ is not available "to correct a mere error in the exercise of conceded judicial power." De Beers Consolidated Mines, Ltd., v. United States, 1945, 325 U.S. 212, 217, 65 S.Ct. 1130, 1133, 89 L.Ed. 1566. It is available, however, to correct judicial action which is not mere error but usurpation of power, id. One of the writ's two traditional uses "both at common law and in the federal courts has been, in appropriate cases, to confine inferior courts to the exercise of their prescribed jurisdiction." United States Alkali Export Ass'n, Inc., v. United States, 1945, 325 U.S. 196, 202, 65 S.Ct. 1120, 1124, 89 L.Ed. 1544. Therefore the distinction to be drawn is between an error in the exercise of a power conferred and an attempt to exercise a power not possessed.

There can be no doubt of the power of the court under Rule 29(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., to order the entry of judgment of acquittal, either on its own motion or on motion of a defendant, as to one or more of the offenses charged in an indictment or information "after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." In spite of the clear wording of the Rule, perhaps, as the Government concedes, although again we do not need to decide and do not decide, judgment of acquittal might properly be entered in some situations even before the close of the Government's case, as, for instance, when the Government's opening statement unmistakably shows that the evidence it proposes to introduce would not sustain a conviction, or when it produces evidence conclusively showing either that it has no case or that the accused has an iron-clad defense. But there is no suggestion of any such situation here, for the judge abruptly termi-

---

4. If cases are to be tried by the judge instead of by counsel, the rules of procedure will have to be drastically revised.

5. Conceivably, although we have no occasion to decide and do not decide, a judgment of acquittal might be warranted in the event that deliberate misconduct of Government counsel is so outrageous as not only to render the trial in progress unfair but also to make a fair trial in the future impossible.

nated the Government's case by ordering the entry of a judgment of acquittal on evidence showing no defense and long before the Government had had an opportunity to show whether or not it had a case; and, moreover, he did so in ignorance of either the exact nature or the cogency of the specific evidence of guilt which Government's counsel said he had available and was ready to present.

■ Primarily on the basis of two cases to be cited and discussed presently, we think that under the circumstances of the case before us the judge had no power, that is to say, jurisdiction, to terminate the Government's presentation of its case in mid-course by entering judgment of acquittal and that mandamus lies to correct the error.

In Ex parte United States, 1916, 242 U.S. 27, 37 S.Ct. 72, 74, 61 L.Ed. 129, the Court held that, practice in certain circuits including this one to the contrary notwithstanding, a district judge in the absence of statutory authority had no power permanently to suspend a mandatory minimum sentence of 5 years for bank fraud and that mandamus lay to require the judge to vacate his erroneous order of suspension.

In reaching this conclusion the Court adverted to the consequences of holding to the contrary, that is, of holding that an inherent judicial power could thwart a legislative determination of sentence saying:

" [I]f it be that the plain legislative command fixing a specific punishment for crime is subject to be permanently set aside by an implied judicial power upon considerations extraneous to the legality of the conviction, it would seem necessarily to follow that there could be likewise implied a discretionary authority to permanently refuse to try a criminal charge because of the conclusion that a particular act made criminal by law ought not to be treated as criminal. And thus it would come to pass that the possession by the judicial department of power to permanently refuse to enforce a law would result in the destruction of the conceded powers of the other departments, and hence leave no law to be enforced."

A later case of the same name, Ex parte United States, 1932, 287 U.S. 241, 53 S.Ct. 129, 131, 77 L.Ed. 283, is more nearly in point. In that case the Court issued its writ of mandamus ordering a district judge to issue a bench warrant, which he had refused to do in the purported exercise of his discretion, for the arrest of one under an indictment "fair on its face" returned by a properly constituted grand jury. The case cited is particularly significant in that it shows that issuance of mandamus by this court in the present case would be in aid of our appellate jurisdiction, and also shows the jurisdictional limits of a trial judge's powers in criminal cases and the necessity for issuing the writ to confine trial judges within those limits.

■ In the first place, since the Court in the case cited above was expressly exercising the original jurisdiction conferred upon it by § 262 of the Judicial Code (the forerunner of present § 1651 (a) of Title 28), we, as an intermediate appellate court, can safely rely upon it as direct authority for our issuance of the writ in aid of our appellate jurisdiction. See Chief Judge Magruder's discussion in In re Josephson, 1 Cir., 1954, 218 F.2d 174, 177–180. If, in spite of the fact that an accused may ultimately be found not guilty, the Supreme Court of the United States, in the exercise of its ultimate discretionary jurisdiction to review actions of the inferior federal courts by certiorari, has power in its discretion to issue mandamus to a federal district court ordering the arrest of one properly charged with crime by a grand jury, then this court, in the exercise of its direct appellate jurisdiction, must also have discretionary power to issue mandamus to require a district judge, or court, to permit the United States to at least present its evidence of guilt when an accused properly charged with crime has been brought to trial. There is thus no need for us to consider whether authority to issue the

writ in aid of our jurisdiction might also be found in Roche v. Evaporated Milk Ass'n, 1943, 319 U.S. 21, 63 S.Ct. 938, 87 L.Ed. 1185, or La Buy v. Howes Leather Co., 1957, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed. 560.

In the second place the considerations on which the Court relied in Ex parte United States, 1932, 287 U.S. 241, 249–251, 53 S.Ct. 129, 77 L.Ed. 283, for its conclusion that the district judge did not have jurisdiction to deny the Government's petition for a bench warrant for the arrest of one properly charged with crime support our conclusion that the district judge in the situation before us did not have jurisdiction to prevent the United States from going on with the presentation of its evidence of guilt. We have specific reference to the statement on page 250, 53 S.Ct. at page 131, that a proper indictment returned by a properly constituted grand jury [6] "conclusively" determined the existence of probable cause for holding the accused to answer to a charge of crime and also to the statement on page 249, 53 S.Ct. at page 131, that the effect of the refusal of the district court to issue a warrant for the arrest of one charged in "an indictment fair upon its face and properly found and returned is equivalent to a denial of the absolute right of the government, as matters stand, to put the accused on trial * * *. The mere statement discloses the gravity and public importance of the question. It is obvious that, if a like attitude should be taken by District Courts generally, serious interference with the prosecution of persons indicted for criminal offenses might result."

These observations, and others we might quote from the same opinion and the cases cited therein, are pertinent here. If, under the circumstances disclosed by the record before us, a district judge for no good reason can halt the presentation of the Government's evidence in a criminal case and enter judg-

ment of acquittal, the action of the grand jury in returning the indictment would be just as much flouted, and the Government fully as frustrated in the performance of its duty to prosecute persons regularly and properly charged with crime as though the judge at the outset had refused to issue a bench warrant for the arrest of the accused. The action of the trial judge in one situation falls as little short of a refusal to permit enforcement of the criminal law as in the other. See Id. at page 250, 53 S.Ct. at page 131. Though the situations are different they are clearly comparable.

The industry of counsel and our own research has unearthed no case squarely in point. But if a trial judge does not have the power to prevent the arrest of anyone properly accused of crime, as held in the later case entitled Ex parte United States, cited above, or to refuse for no valid reason ever to try a criminal charge as indicated in the earlier case of the same name, also cited above, it seems to us to follow that a trial judge has no power arbitrarily to halt the trial of an accused when the government has only begun to present its evidence of guilt. We see no difference in principle between blocking a criminal trial at the threshold and blocking it when the government has barely had a chance to put its toe in the door.

The question of double jeopardy remains for consideration.

■ Strictly speaking the defense of double jeopardy is not now before us. We can confidently anticipate, however, that the defense will be raised by the defendants by a plea of *autrefois acquit*, or former acquittal, when they are set to the bar to be tried again. Therefore, since issuance of mandamus, when within our power, is discretionary, and it would be pointless for us to issue the writ if it were a foregone conclusion that the plea of *autrefois acquit* would be good at another trial, it is appropriate here brief-

---

6. We can say the same for the indictment in the case at bar. At least there is no suggestion to the contrary and mo- tions to dismiss the indictment were denied by the district judge.

ly to advert to the defense of double jeopardy. It will suffice for us to say that from our conclusion that the trial judge had no power, that is to say no jurisdiction, to enter judgment of acquittal, it follows under principles too well established to require citation of authorities that the judgment is void—a nullity—and hence affords no basis for the defense of double jeopardy. See Mitchell v. Youell, 4 Cir., 1942, 130 F.2d 880.

The United States in its application for mandamus has not specifically asked us to order that the case be reassigned for trial before another judge. Nevertheless we shall do so, for we do not see how a judge who has unnecessarily taken it upon himself to cross-examine witnesses not only extensively but also sharply can either listen to their testimony reflectively or weigh their testimony dispassionately.

Mandamus will issue directing that the judgment of acquittal entered in United States v. Standard Coil Products Co., Inc., Fong Foo and Robert Knupp, designated on the Criminal Docket of the United States District Court for the District of Massachusetts as CR. 60–6–W, be vacated and ordering that the above case be reassigned by that court for trial before another judge.

ALDRICH, Circuit Judge (concurring).

If I agreed with the court that one could not be sure of the reason why the district court ordered the acquittal I would have to disagree with its conclusion on the issue of double jeopardy. Since the subject is of some general importance, I will state my reasons.

I cannot think that a court is "without power," that is, "without jurisdiction," [1] to order an acquittal in the midst of the government's case on the ground that evidence already introduced is so fatally defective that no jury could be allowed to convict. The court assumes, *arguendo*,

that it may sometimes be appropriate for a district court to direct an acquittal prior to the closing of the government's case because of some evidentiary defect, but says it is unnecessary to decide. I do not think one can leave this matter hanging, but, rather, I believe its resolution to be all-important.

Not unnaturally, in view of the fact that the government has no general right of appeal, there is a paucity of authority with respect to the right of the court to acquit for evidentiary defects at any preliminary stage. In United States v. Dietrich, C.C.D.Neb.1904, 126 F. 676, at pages 677–678, Circuit Judge (afterwards Mr. Justice) Van Devanter said,

> "Where, by the opening statement for the prosecution in a criminal trial, and after full opportunity for the correction of any ambiguity, error, or omission in the statement, a fact is clearly and deliberately admitted which must necessarily prevent a conviction and require an acquittal, the court may, upon its motion or that of counsel, close the case by directing a verdict for the accused. The court has the same power to act upon such an admission that it would have to act upon the evidence if produced. It would be a waste of time to listen to evidence of other matters when at the outset a fact is clearly and deliberately admitted which must defeat the prosecution in the end."

I see no reason to say the court there erred in applying this well-recognized civil principle to a criminal proceeding. See McGuire v. United States, 8 Cir., 1945, 152 F.2d 577, 580. In like manner, in United States v. Maryland Cooperative Milk Producers, Inc., D.C.D.C.1956, 145 F.Supp. 151, an acquittal was ordered when facts were stipulated during the course of the government's case which the court believed precluded any possibility of criminal liability. See also United

---

1. The court apparently uses "power" and "jurisdiction" interchangeably. Certainly there is no question here about the district court's jurisdiction over the case and over the defendants. Accordingly, I will hereafter use the term "power."

States v. Weissman, 1924, 266 U.S. 377, 379, 45 S.Ct. 135, 69 L.Ed. 334.

In the absence of any contrary authority, it seems inherently reasonable to conclude that at whatever stage a fatal deficiency in the government's evidence irrevocably appears, the court is empowered to acquit.[2] Yet it must follow that if the court can make such a decision *in medias res* when its opinion of the damaging effect of particular facts is correct, it can equally do so when its interpretation is incorrect. If a court truly lacked jurisdiction, that would be one thing, but given power to decide, there must be power to decide erroneously. Therefore the question must be, was the nature of the ruling that the court made here so different that it must be said that the court was entirely without the power to make it.

There can be no doubt that even if a court found no conceded fact, as in the Maryland Cooperative case, fatal to the government, but nevertheless was of the opinion that the government's evidence was so unrealiable and vacillating[3] as to be utterly unworthy of belief, it could order an acquittal at the close of the government's case. The government could not appeal, no matter how erroneous the court's determination. I cannot think that a court is entirely without power to reach the same conclusion before the last witness has testified. It is not always necessary to eat the whole of an egg to know it is rotten. The fact that the court is obliged to put the defendant to the bar, Ex parte United States, 1932, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283, seems a far cry from saying that it cannot, in a bona fide attempt to weigh evidence introduced, conclude that what it holds to be a vital part thereof is so irretrievably bad that no jury could properly convict.[4]

Suppose here that instead of ordering an acquittal forthwith the court had stated that under the circumstances then disclosed all of the remaining evidence offered by the government must be excluded as irrelevant. Manifestly, the power to exclude evidence as irrelevant exists at all times. The government, perforce, would then have rested, and the court's power to acquit would have become absolute. In what way was the court's ruling (if the unreliability of the evidence was its reason for acquittal rather than government counsel's alleged misconduct) other than that evidence already introduced so fatally infected the case that all further evidence was irrelevant in the sense that it could not cure the defect. To say that this was done without sufficient consideration is not to say that it was done without power. I believe the court has been misled by the relative magnitude of the district court's error into confusing a difference in degree with a difference in kind.

However, I think that a different question is raised by the other possible reason for the acquittal, the conduct of the Assistant U. S. Attorney in speaking to his witness during the recess. Here the court's assumption, *arguendo*, (note 5) is that "a judgment of acquittal might be warranted in the event that deliberate misconduct of Government counsel is so outrageous as not only to render the trial

---

2. There is some suggestion in the court's opinion that Fed.Rule of Crim.Procedure 29(a), 18 U.S.C., permitting the court to acquit at the close of the government's evidence and allowing the defendant to move at that time without resting, impliedly indicates that the court may not acquit at any earlier stage. The rule contains, however, no positive prohibition to that effect. I believe the rule merely recognizes a common practice, and encourages it by not restricting the right of the defendant to move. See 5 Moore, Federal Practice ¶ 50.01 [2] (2d ed. 1951).

3. The district court here (wrongfully, I agree) asserted that the witnesses continually and fundamentally contradicted themselves.

4. Even accepting in full the government's suggestion that it is entitled to a trial by jury, such trial traditionally includes the right of the court to conclude that the evidence does not warrant submission. See Patton v. United States, 1929, 281 U.S. 276, 288, 50 S.Ct. 253, 74 L. Ed. 854.

in progress unfair but also to make a fair trial in the future impossible." I find it difficult to imagine circumstances warranting such an assumption. Cf. Caldwell v. United States, 1953, 92 U.S. App.D.C. 355, 205 F.2d 879, 881, note 11, certiorari denied, 349 U.S. 930, 75 S.Ct. 773, 99 L.Ed. 1260. But in all events I agree with the court that it is totally inapplicable.

It must be conceded that it was within the power of the district court to determine, however, erroneously, that the conduct of counsel was improper. But I do not think it follows automatically that the court had power to acquit for that reason. "A criminal prosecution is more than a game in which the government may be checkmated and the game lost merely because its officers have not played according to rule." McGuire v. United States, 1927, 273 U.S. 95, 99, 47 S.Ct. 259, 260, 71 L.Ed. 556. When a court acquits in the middle of the government's case because of what it believes to be an incurable defect in the evidence, it has made a judgment on the government's case as a whole. A ruling of misconduct, however, is only a judgment as to the procedure in the particular trial. What corrective steps the court should take after its determination of a procedural error is a separate question. To make the same assumption that the court makes in its opinion, that "deliberate," "outrageous" misconduct which would project its unfairness into a future trial would warrant an acquittal forthwith, does not advance the matter, because that is far from our case. The district court made it abundantly clear that the error, as it considered it, committed by the Assistant U. S. Attorney was based upon ignorance of the court's rule,[5] and was anything but deliberate. Nor was any question of prejudice to the defendants possibly involved. The only testimony which the witness had changed as a result of conferring with counsel was the date of a particular conference. The date was a preliminary matter. Nothing about the conference had been admitted in evidence. The present effect of this new testimony upon the trial was nil. Its future effect was entirely in the control of the court, who could exclude any future evidence relating to this as yet undisclosed conference. This was not a question of degree. Prejudice to the defendants was entirely nonexistent.

Under these circumstances I do not think the court had any more power to order an acquittal than it would have had on the basis of some rule of thumb that more than three government questions, asked in good faith, but regarded by the court as irrelevant, had unduly delayed the trial.

While courts can do, and must be permitted to do, unwise and even foolish things, I think there must be some limit to naked, arbitrary power. As against a defendant's right to be free from double jeopardy, there is the interest of the public in the prosecution and conviction of criminals. See, e. g., Green v. United States, 1957, 335 U.S. 184, 216–219, 78 S. Ct. 221, 2 L.Ed. 199. (Frankfurter, J., dissenting). In some instances this has been permitted to override what, strictly, is a second jeopardy, or at least an extended jeopardy. Cf. Wade v. Hunter, 1949, 336 U.S. 684, 688–690, 69 S.Ct. 834, 93 L.Ed. 974; cases collected in United States v. Gori, 2 Cir., 1960, 282 F.2d 43, 48 (dissenting opinion), certiorari granted 81 S.Ct. 282. Whatever may be the correct philosophy of judicial power, I am unwilling to think that such a totally arbitrary act in the course of trial with no semblance of justification behind it;[6] should deprive the government of its

---

5. An understandable ignorance, since twice before during the trial the court had expressly invited a government witness to confer with counsel during recess about his testimony, and in one instance to "rehearse it with counsel."

6. Unless one wanted to say it was to teach government counsel a lesson for not knowing the rules—which is scarcely a judicial function. It would be doubly inappropriate here in view of the court's prior instructions. See n. 5, supra.

day in court. This may be an exceptional ruling, but this is an exceptional case.

Since I think different consequences flow from the two suggested grounds of the district court's acquittal, it is essential to determine, if possible, which one was the actual basis of its action. With all respect, I do not share the court's expressed uncertainty. As soon as it appeared why the witness had changed his testimony the district court excused the jury and asked the Assistant U. S. Attorney, "As a matter of personal privilege do you want to make any statement?" The court stated that in talking to his witness counsel had violated an "elementary rule," and that it was "interested in whether this is a situation in which I must respond to a motion." The court then described counsel's conduct as "a violation of civil liberties." Subsequently the court called the jury, stated that counsel were acting "subjectively in good faith [but that] the standards of a criminal prosecution in the United States require a constant awareness of the rights and liberties guaranteed by the United States Constitution." It is true that thereafter the court mentioned the government witnesses' "lamentable lack of awareness or lack of capacity in connection with their testimonial obligations," and discussed the case generally. But it returned at some length to counsel's conference with the witness, discussed extorted confessions, unlawful search and seizure, and "the duty of a court to see that every man gets a fair trial," and concluded, "Bearing in mind these principles, and responding to the motions for acquittal made by counsel * * *, I direct you at this stage to return the verdicts of acquittal * * *."

It may be that the district court would not have conceived of this "elementary rule" if it had not already been annoyed with the testimonial deficiencies of the witnesses, but I have no reluctance in concluding that the reason it granted the motions for acquittal was the same one that caused it to invite them—namely, counsel's violation of the "rule." Accordingly, I concur in the judgment of the court.