**UNITED STATES of America, Appellee,**

**v.**

**Ray E. STANLEY, Appellant.**

**No. 71-1793.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1971.

Decided Feb. 28, 1972.

Augustus Anninos, Norfolk, Va. (Howell, Anninos & Daugherty, Norfolk, Va., on brief), for appellant.

Michael Rhine, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on brief), for appellee.

Before BOREMAN, Senior Circuit Judge, and BUTZNER and RUSSELL, Circuit Judges.

BOREMAN, Senior Circuit Judge:

On Monday, October 19, 1970, agents of the Federal Bureau of Investigation, acting on information supplied by an informant, went to the home of Mr. and Mrs. Case in Norfolk, Virginia. The premises were searched with the permission of Mr. Case, and the agents discovered in the garage two Honda motorcy-

cles, each identifiable by its frame number and motor number. One of the motorcycles was assembled and the other was still in the original shipping crate. In response to the agents' questioning, Mr. and Mrs. Case stated that the two motorcycles,· each in a shipping crate, were brought to their garage at about noon on Sunday, October 18, 1970, by Ray E. Stanley (hereinafter Stanley or appellant) and Richard Calvin Agnor in Agnor's pickup truck. Mrs. Case said that from about 7:00 p. m. to 10:00 p. m. that Sunday evening, Stanley, Agnor and Frank Eugene Henderson had worked on assembling one of the motorcycles. These two motorcycles had been stolen from a pier at the Lambert's Point Dock in Norfolk on October 17 or 18, 1970, after being off-loaded from a Japanese ship. Stanley, Agnor and Henderson were indicted for receiving and having in their possession the two Honda motorcycles knowing them to have been stolen from a storage facility, depot and wharf while moving as part of a foreign shipment of freight, in violation of 18 U.S.C. § 659.

The three persons named in the indictment were tried separately. Agnor was acquitted by a jury. Henderson was convicted by a jury but the trial judge granted his motion to set aside the verdict and entered a judgment of acquittal.[1] Stanley was convicted by a jury, sentenced to a term of three years, and committed to the custody of the Attorney General for a period of sixty days with execution of the remainder of the sentence suspended; he was placed on probation for a period of three years following his release from confinement. We find it necessary to reverse and remand the case for a new trial.

At trial Agnor testified that appellant had borrowed his (Agnor's) pickup truck on October 17, 1970, sometime after six o'clock in the evening. Agnor said that appellant kept the truck overnight and about 11:30 a. m. the following day, Sunday, called him and asked if he could use Agnor's garage to work on some motorcycles. Because there was not sufficient room in his garage for such work Agnor agreed to telephone people he knew and attempt to locate a suitable place. Agnor eventually got permission from the Cases to use their garage and he and appellant took the motorcycles there. Agnor further testified that Stanley had told him on that Sunday that an acquaintance of his by the name of "Warren" had a friend in either Vietnam or Japan who sent the motorcycles to Warren and that appellant had agreed to assemble the motorcycles for Warren.

In his own testimony Stanley supplemented the story as told by Agnor. Stanley's version was as follows. He had first met Warren in a pool hall about five or six months prior to October 18, 1970, and they had at that time talked about collecting and trading guns, an avocation of appellant. Warren later visited Stanley's home on one occasion to view his gun collection and during one of their two meetings Stanley had told Warren that he had had some experience in assembling and disassembling motorcycles. He next heard from Warren prior to Saturday, October 17, 1970, when Warren called him on the telephone. As a result of that phone call Stanley borrowed Agnor's truck on October 17 and drove to a restaurant where he met Warren and Stanley agreed to assemble a new motorcycle for Warren for approximately $75.00; and at Warren's direction the two men then drove to a garage where they loaded the two crated Honda motorcycles onto Agnor's truck. Stanley parked the truck in front of his home for the night and the

---

1. Henderson was also charged in a separate count of the indictment with illegally receiving and possessing a stolen mini-Honda motorcycle, which count did not involve either Stanley or Agnor. Henderson's motion to set aside the jury verdict of guilty as to this count was denied by the trial judge, and the conviction was affirmed *per curiam* by a panel of this court without oral argument.

next day contacted Agnor to inquire about the use of his garage but, because there was no room in Agnor's garage, the motorcycles were subsequently taken to the Case garage. Later that same day Stanley asked Agnor to help him assemble the motorcycle and the aid of Henderson was enlisted when Henderson called to invite Stanley to go fishing that night. Stanley did not know whether "Warren" was the first or last name of his acquaintance and he did not know Warren's address. Warren was to contact him within a few days to regain possession of the motorcycles. Stanley denied stealing the motorcycles and denied any knowledge that they had been stolen.

Thus the credibility of Stanley's testimony relating to the circumstances under which he claimed to have obtained the motorcycles from "Warren" was the primary question presented for jury determination. The resolution of this issue by the jury must in large measure have directly influenced them in reaching a determination with respect to Stanley's knowledge that the motorcycles were stolen at the time he received and possessed them. If the jury believed Stanley's story it appears that a verdict of not guilty must follow. In closing argument, the Assistant United States Attorney apparently was attempting to persuade the jury that appellant had testified falsely in this respect. The trial transcript discloses the following:

> MR. RHINE (Assistant U. S. Attorney): It's the government's position that, based on the evidence, the testimony from that man (appellant), the government does not think there is a person called Warren. *The government hadn't heard about Warren until yesterday.* [Emphasis added.]

> MR. ANNINOS (defense counsel): There is no evidence as to that, may it please the Court.

> I'm not trying to—

> THE COURT: That's a proper inference for counsel to relate to the jury.

> MR. ANNINOS: All right, sir.

> MR. RHINE: Now, just a few other—

> MR. ANNINOS: Now, may it please the Court, Mr. Rhine knows that in a previous proceeding Mr. Agnor mentioned Warren two months ago.

> I don't want this—

> THE COURT: Mr. Anninos—

> MR. ANNINOS: I am very serious.

> THE COURT: Mr. Anninos, do not interrupt his argument.

> Ladies and gentlemen of the jury, disregard the statement made by Mr. Anninos that Mr. Rhine knows certain things. Whether he knows them or doesn't know them is for Mr. Rhine to relate them to you or to let them be related to you by the evidence.

The statement by the Assistant United States Attorney that the *Government* had not heard about Warren until the previous day not only went beyond the evidence but also was factually incorrect. The Government agrees that at Agnor's trial, conducted nearly two months prior to that of this appellant, both Agnor and another witness had testified that Stanley had told them about the existence of "Warren." The mistake appears to have been inadvertent—the Assistant United States Attorney who tried the case for the United States against this appellant was not working with the United States Attorney's office at the time of Agnor's trial and was unfamiliar with the evidence in that trial. Nevertheless, the erroneous assertion clearly tended to leave the impression with the jury that the story about "Warren" had been concocted recently and solely for purposes of Stanley's trial. The jury then might

well have concluded that Stanley's testimony was false on the basis of such an impression.

On the facts of this case we cannot say that the error did not have "substantial influence" upon the jury verdict, Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), and that, therefore, it is to be disregarded as harmless. Fed.R.Crim.P. 52(a). To the contrary, it is clear that there is a more than "reasonable possibility that the [error] complained of might have contributed to the conviction." Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). The evidence of Stanley's knowledge of the theft of the motorcycles at the time he received and possessed them, although legally sufficient to be submitted to the jury, could not be characterized as "overwhelming," as the evidence was found to be in Butler v. United States, 191 F.2d 433 (4 Cir. 1951).[2]

It was up to the jury to either believe or disbelieve appellant's testimony just as the credibility of any other witness is determined. Objection was interposed to government counsel's statement to the jury but further efforts to pursue the objection or to explain and clarify were foreclosed when the court admonished defense counsel against further interruption and instructed the jury, in effect, to accept the statements of the prosecutor as true. The improper statement to the jury by government counsel could have tipped the scales in favor of the Government. United States v. Gambert, 410 F.2d 383 (4 Cir. 1969). We think Stanley is entitled to a new trial.

We find no merit in the appellant's other assignments of error.

Judgment vacated and remanded for a new trial.

---

**2.** *Cf.* United States v. Upchurch, 286 F.2d 516 (4 Cir. 1961).