**UNITED STATES of America,
Appellee,**

v.

**John C. DORAN, Jr., Defendant-
Appellant.**

**No. 72–1210.**

United States Court of Appeals,
First Circuit.

Aug. 13, 1973.

William P. Homans, Jr., Boston, Mass. with whom Featherston, Homans, Klubock & Griffin and Francis C. Lynch, Jr., Boston, Mass., were on brief, for defendant-appellant.

Alan R. Hoffman, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

John C. Doran appeals from his conviction on two counts of a four count indictment charging him with conspiring to distribute and distributing heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846. In addition to challenging the district court's denial of his motion for a judgment of acquittal, Doran asserts that he was prejudiced by an erroneous statement of the evidence during the prosecutor's summation to the jury, and by the trial judge's frequent and allegedly hostile questioning of himself and other defense witnesses. We find no error in the proceedings below and accordingly affirm the judgment of the district court.

The somewhat complicated facts of this case involve three distinct narcotics transactions which took place in appellant's house during late November and early December 1971. Appellant's basic defense at trial was that these transactions occurred either without his knowledge or without his active participation, and that at no time did he intend to aid in the distribution of heroin in the sense of affirmatively seeking to bring about such a distribution. See Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949). Specifically, appellant contended that the events in question took place at the instigation of codefendant George Tucker, who was then living at Doran's residence as his tenant. The indictment alleged the appellant's participation, with Tucker and several others, in a conspiracy to distribute heroin between November 29 and December 6, 1971, and also his actual distribution of the drug on December 2 of that year. The relevant facts concerning the three incidents involved in this case are as follows.

*The November 29 Transaction*

On November 29, 1971, federal agents Lemon and Maloney, acting pursuant to information received from a government informant, met one Michael Principe (also a codefendant in this case) in Cambridge, Massachusetts for the purpose of arranging a heroin transaction. At Principe's direction, the two agents and the informant drove to appellant's house in Arlington, Massachusetts, where the sale was to take place. On the way to Arlington, Principe described his "connection" as being a radar engineer who owned a $30,000 house and a new Cadillac. Upon arrival at their destination, Lemon and Principe left the car and entered appellant's house with Tucker. After some general conversation with Tucker concerning the heroin to be purchased, Lemon overheard one end of a telephone conversation between Tucker and an individual whom the latter referred to as "Jack." This conversation was to the effect that Tucker was still waiting for a person named "Jimmy" to arrive at the house. When Tucker hung up, Lemon asked him whether he had been talking to his "connection." Tucker denied this, saying instead that he had been speaking with the owner of the house who was upset because a drug transaction was going to take place there. Sometime later, one James Hill (also a codefendant) arrived and was admitted by Tucker. Hill and Tucker then entered the kitchen, and when they returned to the living room, Tucker gave Lemon a tinfoil package containing an ounce of heroin and the agent in turn handed Hill $1,000. As Lemon and Principe were about to depart, Doran entered the house through the front door. There was no conversation between appellant and Lemon at this time.

During the return trip from Arlington, however, there was a further discussion between Lemon and Principe. In the course of this converstion, Principe outlined the various roles of the above-mentioned individuals in the narcotics business. According to Principe, Tucker and Hill were merely underlings of Doran, who was the overall supplier of heroin. Principe also claimed that a "stash" of narcotics was kept in Hill's apartment and that the rent for this apartment was paid by appellant.

## The December 2 Transaction

On December 2 Tucker called Lemon to tell him that another heroin sale had been arranged and that he and Maloney should come to Doran's house at 11 a. m. on that day. The two agents arrived at the house in accordance with these instructions and were admitted by Tucker. Shortly thereafter, Doran entered the living ·room where the two agents and Tucker were awaiting the arrival of Hill. Lemon asked Doran whether he objected to Lemon's "doing business" in his house. According to the agents, Doran replied that he did not mind, but that he objected to a lot of people coming into the house since his neighbors were "very suspicious." Lemon then asked Doran whether his sister, who lived next door, was aware of his "involvement," presumably with heroin. As recounted by the agents, appellant asnwered that his sister knew of his past involvement with narcotics, but was unaware that he was "still in the traffic." [1] At sometime during this conversation, Agent Lemon asked Tucker to call Hill in order to determine whether he had left yet. Doran then stated that he had just called Hill and gotten no answer, and that he therefore assumed that he was on his way.

Doran added that Hill had probably had to stop somewhere to pick up the heroin.

At about 12:30 p. m. Hill arrived and was admitted by Doran who advised him in rather strong language that he was late. Doran, Tucker, Hill and Lemon then entered the kitchen, where Hill produced two tinfoil packages containing heroin, handing one to Doran and one to Lemon. Doran immediately removed a "cooking" device from a cabinet and, after measuring a quantity of heroin from the package which Hill had given him, left the kitchen to enter his bedroom. Tucker commented that the heroin given to Doran was for their own use (presumably Tucker's and Doran's) and did not belong to Lemon. After appellant had left the kitchen, Lemon gave Hill $1,000 and the agents left.

## The December 6 Incident

On December 6 Lemon received a telephone call from Tucker informing him that Hill was on the way to Doran's house for the purpose of another heroin transaction, and that he and Maloney should therefore proceed to Arlington. The two agents then went to appellant's house where they found Tucker and one Ralph Arcieri. The four men engaged in a general conversation concerning narcotics until about 3 p. m. when Hill arrived followed directly by Doran. Hill immediately announced that he "had the stuff," and showed a tinfoil package to Lemon. All present, including the appellant, were then arrested by the agents.

### I

■■■■ Appellant contends that, on the above evidence, the district court erred in denying his motion for judgment of acquittal. We do not agree.

---

1. Doran denied having made either of these replies to Lemon's queries. In answer to the first question, appellant testified that he told the agents that they were in his house and might as well stay, but that they should take their business elsewhere in the future. With regard to the question concerning his sister, Doran maintained that he had merely answered that she did know of his former addiction to heroin, but that he had said nothing which would imply his past or present involvement in the business of selling narcotics.

Admittedly, this case was a very close one.[2] Nevertheless, we think that the evidence as a whole, considered in the light most favorable to the government, together with all legitimate inferences to be drawn therefrom,[3] Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Parker v. United States, 378 F.2d 641, 644–645 (1st Cir.), cert. denied, 389 U.S. 842, 88 S.Ct. 81, 19 L.Ed.2d 107 (1967), was clearly sufficient to sustain appellant's conviction. While it is true that appellant did not directly participate in the events of November 29, the jury could have inferred, on the basis of Tucker's telephone conversation with an individual named "Jack," who owned the house in which Tucker lived, that Doran had prior knowledge of the November 29 transaction and was anxious to be kept informed as to its progress. Similarly, appellant's attempted phone call to Hill on December 2, his remark that Hill had probably stopped to pick up the heroin, and his apparent annoyance at Hill's tardiness were all susceptible to the inference that appellant was an active particpant in the sale of heroin which took place on that date. This inference is strengthened when considered in connection with Doran's statement to the agent that he was "still in the traffic," his expressed lack of objection (beyond some worry about the suspicions of his neighbors) to a drug transaction being conducted in his house, and his simultaneous arrival with Hill on December 6. Moreover, this independent evidence of appellant's particpation in a criminal conspiracy was sufficient to justify the admission of the agent's hearsay testimony as to Principe's incriminating statements about Doran's involvement.[4] See United States v. Johnson, 467 F.2d 804, 807 (1st Cir. 1972), cert. denied, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 271 (1973). Finally, the jury would have been warranted in finding that the use of appellant's house as the scene of successful or abortive drug sales on three separate occasions was not entirely without significance. We conclude that the above evidence was sufficient to allow the jury to fairly find the appellant guilty beyond a reasonable doubt, both as to the conspiracy count and the substantive offense.

## II

■ Appellant also argues that he was unfairly prejudiced by the prosecutor's misstatement of a portion of the evidence during his summation to the jury. As noted above, appellant's primary defense at trial was that Tucker had arranged the drug sales in question, and that the extent of his own involvement had not gone beyond mere acquiescence. In support of this theory, appellant testified that he had been enraged upon his discovery of the November 29 transaction, and had ordered Tucker to leave his house as a result. According to Doran, he had allowed Tucker to return only upon the latter's promise that there would be no more drug sales conducted in the house, and that Tucker, an addict, would enter a drug rehabilitation program. Appellant also testified that he had been similarly angered by the December 2 sale, but had allowed Tucker

2. Having so stated, we shall make no attempt to recount here all of the considerable testimony which supported appellant's version of the events in question. In this case, as in every case where conflicting testimony and the credibility of witnesses is involved, "the jury could have disbelieved all." Colella v. United States, 360 F.2d 792, 803 (1st Cir.), cert. denied, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966).

3. Appellant's citation of Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608, 612–613 (1957) in an apparent challenge to this standard of review is clearly inapposite, since Carter dealt with an erroneous jury instruction rather than with an appellate court's review of the denial of a motion for judgment of acquittal.

4. We therefore reject appellant's contentions of error directed at the district court's refusal to strike this evidence as against Doran.

to remain because he was scheduled to enter a drug clinic in a few days. During the government's attempt to discredit this testimony on cross-examination, the following colloquy occurred:

"Q. Well, Tucker had been an addict to your knowledge for at least 18 months, had he not?

A. Yes, sir.

Q. And had there ever been representations or discussions between the two of you about going into a clinic?

A. Yes, sir.

Q. Had he ever suggested that he was going to go into a clinic prior to the early part of December 1971?

A. I took him one time myself.

Q. You took him to a clinic?

A. Yes, sir. More than one time."

In his closing argument to the jury, the United States Attorney made the following statements:

"There was the conversation or the testimony by Mr. Doran in which he presumably would have you believe that he let Tucker return to 63 Edmund Road [Doran's address] because of a promise to enter a clinic and because no more deals would take place. But what about the 18 months prior to that that he and Tucker had lived together? What about the months in which he didn't make this sort of commitment to or exact this sort of promise from Mr. Tucker?"

Appellant's attorney immediately objected to this argument, characterizing it as a misstatement of the evidence. While this objection was overruled, the district court instructed the jury at the close of the case that it was to disregard all arguments of counsel not based on the evidence, illustrating this principle by saying: "If, for example, you find no evidence to support the argument of government counsel that Doran never did anything to get Tucker into a clinic . . . obviously you have got to disregard that argument." Appellant maintains that this belated instruction was inadequate to cure the prejudice which he had suffered, emphasizing particularly the weakness of the government's case against him and the tentative phrasing of the court's charge, which he contends allowed the jury to consider the prosecutor's comments if it chose to do so. We think, however, that the instruction was more than generous. The prosecutor had talked about the absence of the exaction of a commitment or a promise from Tucker by appellant. The evidence showed merely that there had been discussions between the two and that appellant had taken Tucker to a clinic more than once. The court, in instructing the jury that it must disregard the goverment's argument if the evidence failed to show that appellant "never did anything to get Tucker into a clinic," was establishing a more stringent test than the challenged remarks merited. There was no error.

Even if our interpretation of the prosecutor's comments were incorrect, however, the circumstances of this case still would not warrant reversal. If, as appellant contends, there was a misstatement of the evidence by the United States Attorney, it concerned a matter clearly collateral to the main issue before the jury. Thus, the present situation is distinguishable from cases such as *Corley v. United States*, 124 U.S. App.D.C. 351, 365 F.2d 884 (1969) where the prosecutor's misrepresentations touched upon matters directly relating to the question of guilt or innocence.[5] In view of the collateral na-

5. In *Corley*, for example, the prosecutor erroneously argued to the jury that all three of the defendant's alibi witnesses had fixed the date of his attendance at a party as being on the Saturday preceding his arrest, which was not the date of the crime in question. In fact, only one of these witnesses had arguably so testified. In reversing defendant's conviction, the court referred to the "highly prejudicial" nature of the prosecutor's misstatements, noting that they "made the difference between a strong alibi and no alibi." 365 F.2d at 885. The differences between *Corley* and the present case should require no further elabora-

**374**

ture of the testimony here involved, as well as the district court's instruction to the jury, we are confident that the verdict was not influenced by any possible error in the prosecutor's final argument.[6] *See* Marks v. United States, 260 F.2d 377 (10th Cir. 1958), cert. denied, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed. 2d 302 (1959); *see also* Gaither v. United States, 134 U.S.App.D.C. 154, 413 F. 2d 1061, 1078–1080 (1969).

## III

■ Appellant also seeks reversal on the ground of the district court's allegedly improper questioning of himself and other defense witnesses. First, we note that no objection was taken to the court's questioning prior to the completion of the testimony of witnesses Doran and Tucker, during which all of the now complained of colloquies occurred. The question thus arises whether we are to be governed by the "plain error" standard on appeal. Appellant contends, citing United States v. Wyatt, 143 U.S. App.D.C. 136, 442 F.2d 858 (1971) and United States v. Hill, 332 F.2d 105 (7th Cir. 1964), that he should not be strictly held to the requirement of an express objection in this situation, since such an objection could have conveyed to the jury the impression that the judge was hostile to the defendant's case. To the extent that the above cases may be read as supporting this view, we decline to follow them under the circumstances here presented. *But cf.* In re United States, 286 F.2d 556, 561 (1st Cir. 1961), rev'd on other grounds sub nom.

Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962). The requirement of prompt objection to possible errors by the trial court is designed to prevent counsel from allowing the record to be seeded with error as a hedge against a possibly unfavorable jury verdict. In the present case, had appellant immediately made known his objections to the district court's interrogation of defense witnesses, it is quite possible that much of what is now alleged to have been prejudicial might never have occurred. Moreover, if counsel was concerned about the effect of such objections on the jury, the mechanism of a bench conference was available. As the transcript clearly indicates, this device provided an adequate means of raising the issue, outside the hearing of the jury, when appellant belatedly decided to place his objections on the record.

■ Notwithstanding the above we have carefully examined the transcript to determine whether the district court maintained the necessary "aura of impartiality" in conducting this case. Our review convinces us that there is little to support appellant's assertion that the trial judge questioned defense with "hostility" or in a manner derisive of defendant's cause." United States v. Fry, 304 F.2d 296, 298 (7th Cir. 1962). It is established beyond peradventure that, in federal jury trials, "the judge is not a mere moderator," Querica v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), but may in his sound discretion

---

tion. *Compare also* United States v. Achtenberg, 459 F.2d 91 (8th Cir. 1972); United States v. Stanley, 455 F.2d 644 (4th Cir. 1972); King v. United States, 125 U.S.App.D.C. 318, 372 F.2d 383 (1966).

**6.** Since appellant has placed such emphasis on the evidence tending to show that he objected to heroin transactions being carried on in his house, we note parenthetically at this point that such dis-

pleasure would not necessarily be inconsistent with an inference, based on the testimony discussed in Part I, *supra*, that appellant was an active member of the conspiracy alleged in the indictment. To paraphrase our statement in a different context, such behavior could as easily reflect the "circumspection of the criminal" as the "conscience of the upright." Kadis v. United States, 373 F.2d 370, 374 (1st Cir. 1967). What the situation was here was for the jury to say.

question witnesses "in aid of truth and in furtherance of justice." Gomila v. United States, 146 F.2d 372, 374 (5th Cir. 1944). *See, e. g.,* Glasser v. United States, *supra* at 83 of 315 U.S., 62 S.Ct. 457; United States v. Barbato, 471 F.2d 918, 922 (1st Cir. 1973); O'Brien v. United States, 411 F.2d 522, 523 (5th Cir. 1969); United States v. DeFillo, 257 F.2d 835, 839 (2d Cir. 1958), cert. denied, 359 U.S. 915, 79 S.Ct. 591, 3 L. Ed.2d 577 (1959); United States v. Rosenberg, 195 F.2d 583, 592–595 (2d Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 652 (1952). The fact that some of the questions asked by the court in this case may have opened new lines of inquiry, *see* United States v. Taglianetti, 456 F.2d 1055 (1st Cir. 1972), or, in a few instances, cast doubt upon the credibility of certain witnesses,[7] *see* United States v. DeFillo, *supra*, at 839–840 of 257 F.2d, does not in itself call for reversal. Especially in view of the court's careful instruction to the jury on this matter,[8] we conclude that nothing even approaching plain error was committed here. On the contrary, there was ... all.

Affirmed.

---

7. The following language from Simon v. United States, 123 F.2d 80, 83 (4th Cir.), cert. denied, 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941), is instructive:

"It cannot be too often repeated, or too strongly emphasized, that the function of a federal trial judge is not that of an umpire or of a moderator at a town meeting. He sits to see that justice is done in the cases heard before him; and it is his duty to see that a case on trial is presented in such a way as to be understood by the jury, as well as by himself. He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other."

8. The court instructed the jury as follows: "You are the judges of the facts, however, just as completely as I am the judge of the law. You are the sole and exclusive judge of the facts. . . . If during the trial or during my instructions that I am now giving the Court intimates any opinion as to the facts, you are not bound by any opinion of mine as to the facts. During the course of the trial, I have occasionally in this case, as in every case, asked questions of a witness in order to bring out facts not at that juncture fully covered by the testimony. Do not assume that I hold any opinion on matters to which my questions may have related. Remember at all times that you as the jurors are at liberty to disregard all comments of the court in arriving at your own findings as to the facts."