UNITED STATES of America, Appellee,

v.

William PETERS, Richard F. Ellis, and
Peters Fabrics, Inc., Defendants,
Appellants.

No. 83–1471.

United States Court of Appeals,
First Circuit.

Argued Feb. 9, 1984.

Decided April 23, 1984.

R. Robert Popeo, Steven J. Brooks, and John M. Connolly, Boston, Mass., with whom John Foskett, Deutsch, Glass & Brooks, Paul D. Wilson, and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Boston, Mass., were on brief, for Peters Fabrics, Inc., Richard F. Ellis, and William Peters.

Maurice R. Flynn, III, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN and ALDRICH, Circuit Judges, and GIGNOUX,* Senior District Judge.

COFFIN, Circuit Judge.

Defendants Peters Fabrics, Inc., its president, William Peters, and its vice president, Richard Ellis, appeal from convictions for mail fraud, 18 U.S.C. § 1341, and conspiracy, 18 U.S.C. § 371, arising out of a scheme to defraud their insurance company by claiming property loss due to fire and theft. The jury convicted all defendants on two counts of mail fraud and one count of conspiracy. Prior to sentencing, the district court granted Ellis's motion for judgment of acquittal on one of the mail fraud counts. Defendants challenge the sufficiency of the evidence, the government's belated disclosure of *Brady* material, and the district court's order barring defendants from cross-examining the key government witness regarding his psychiatric history. We affirm.

## I. *Sufficiency of the Evidence*

The following outline of the evidence (and reasonable inferences drawn therefrom), which we must view in the light most favorable to the government, demonstrates that a jury could have found guilt beyond a reasonable doubt as to each conviction.

■ Defendants sought insurance payments of nearly $1 million for damages resulting from a fire at a leased warehouse on Sleeper Street in Boston and from a theft of merchandise alleged to have occurred at the warehouse before the fire. Peters Fabrics, Inc., a buyer and seller of wholesale and retail fabrics, leased the Sleeper Street warehouse on a month-to-month basis in the spring of 1977 in the course of moving from its main warehouse on Congress Street in Boston to Dedham, Massachusetts.[1] Peters Fabrics obtained fire and theft insurance for the Sleeper Street warehouse. The insurance terms required the company to install a burglar alarm at the newly leased warehouse. Unbeknownst to the defendants, the alarm system automatically recorded the times of any openings or closings of the two doors

---

* Of the District of Maine, sitting by designation.

1. Defendants Ellis and Peters and one other unindicted co-conspirator, Peters Fabrics' comptroller Nisson Sherman, gave conflicting and internally inconsistent reasons for leasing the space at Sleeper Street. Sherman and Peters testified that the company wanted to maintain a "presence in downtown Boston", although the company leased the property only on a month-to-month basis and did not lease any other Boston property after the fire. Peters later testified that the "only reason" certain goods were stored at Sleeper Street was to facilitate their shipment to New York. Ellis testified that the Sleeper Street space was to be used for storage of goods to be sold in the near future, yet he admitted that at the time of entry into the lease the company had no orders for the slow-moving goods stored in the warehouse.

and two elevators leading into the warehouse.

Defendants directed the transfer of more than 20 shipments of fabric to the warehouse in late May and early June, 1977. Edward Fallon, Jr., the company's warehouse manager and an unindicted co-conspirator, testified under a grant of immunity that many of the goods shipped were a pigmented denim material, which he described as "unmerchantable" "junk". Testimony of other witnesses showed that the company had been unable to sell the material, the value of which was then in a depressed state. Fallon testified that some goods were falsely labeled so as to appear to be of high quality, and that some rolls of fabric were wrapped in paper, which required more time and effort than the usual practice of wrapping the fabric in plastic bags. Fallon testified that when he asked Ellis why the goods were being wrapped in paper and wondered aloud whether the company was planning a fire, Ellis "got very upset and said something to the effect, shut the so and so up or you will end up in the F"ing unemployment office".

On June 23, 1977, an arson fire occurred at the Sleeper Street warehouse. When the fire department responded to the alarm, the door leading into the warehouse was locked. Various Peters Fabrics employees had access to the key to that door. The fire had been set by unknown persons using Coleman fuel at six separate locations in the warehouse. Fallon testified that sometime during the afternoon of the fire defendant Ellis had told Fallon that Ellis would secure the Sleeper Street warehouse that day.

Months later, Peters Fabrics' insurance company received in the mail insurance claims for material damaged by fire and for material lost due to theft before the fire. This mailing gave rise to Count One of the indictment. After the insurance company rejected both claims, Peters Fabrics brought suit against the company. On October 27, 1978, Peters Fabrics' attorney mailed William Peter's interrogatory answers to the insurance company's attorney. This mailing gave rise to Count Two of the indictment.

Fallon testified that bills of lading and shipment records that accompanied the insurance claim forms had been falsified to exaggerate the amount and quality of fabric the warehouse had contained before the fire. Fallon testified that the fabrics remaining after the fire were the only fabrics to have been shipped there.

The alarm records corroborate Fallon's testimony that no theft occurred at the warehouse. Alarm record times contradict delivery times indicated on some of the bills of lading. For instance, on some days on which the alarm records indicate no entrances into the warehouse, bills of lading indicate the delivery of goods. Defendants claimed that the last delivery to the warehouse was made on June 21, 1977, and that the claimed theft of more than 230,000 yards of material occurred between then and the fire on June 23 at 4:18 p.m. The alarm records for June 22 indicate only an opening and closing of the door at 4:12 p.m., followed immediately by another opening and closing. On June 23, the day of the fire, the alarm records show only a single entry at 3:36 p.m., less than an hour before the fire alarm sounded.

Michael Mantuck, vice president of the salvage company that removed fire- and water-damaged goods from the warehouse, testified that the claimed theft of 230,000 yards of fabric would have required at least 150–160 man-hours, or two full days' work by a ten-man crew. The alarm records show that such work could not have been performed. Mantuck also testified that after the fire approximately 75 per cent of the storage space in the warehouse was filled with fabrics (170,000 yards), and that, in his opinion, another 230,000 yards of material (claimed to have been stolen) would not have fit in the warehouse.

The above recitation of facts forecloses any argument that the jury could not reasonably have inferred that the defendants had devised a "scheme or artifice to defraud", 18 U.S.C. § 1341, and had evi-

denced a specific intent to do so. We also consider the jury fully justified in finding that defendants had caused the mails to be used, within the meaning of the mail fraud statute. *See United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974); *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954); *United States v. Martin,* 694 F.2d 885, 889–90 (1st Cir.1982). The jury could have found that the defendants could reasonably have foreseen that their attorneys would send the insurance claim forms and interrogatory answers through the mail or that the defendants knew that these mailings would follow in the ordinary course of business. Each set of mailed documents clearly furthered the fraudulent scheme.[2]

■ The facts outlined above also provide more than enough evidence to support the conspiracy convictions. The jury did not have to make a leap of faith to find that defendants had committed mail fraud offenses pursuant to a mutual understanding or agreement. As we have stated before, " '[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a "development and a collocation of circumstances." ' " *United States v. Cincotta,* 689 F.2d 238, 241 (1st Cir.) (quoting *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982); *accord United States v. Bithoney,* 631 F.2d 1, 5 (1st Cir.1980), *cert. denied,* 449 U.S. 1083,

101 S.Ct. 869, 66 L.Ed.2d 808 (1981). Peters and Ellis each performed some tasks that were essential to the execution of the scheme and were consistent with their participation in an agreed upon plan. The jury could reasonably have disbelieved that Peters and Ellis, as cousins and as president and vice president, respectively, of a relatively small company,[3] acted entirely independently of one another and of other company employees who furthered the scheme in performing actions that support the convictions of Ellis and Peters for the underlying substantive offense, mail fraud. Defendants strain credulity in suggesting that Ellis did not know that the company had insured the Sleeper Street premises, that Ellis may have falsified internal company documents after the fire and alleged theft for reasons unrelated to the fraudulent scheme, and that Peters was so unfamiliar with the contents of the Sleeper Street warehouse that he could have signed the insurance claim form and the interrogatory answers alleging theft without knowing those statements to be false.[4]

Defendants argue that they may not properly be convicted of conspiracy, asserting that the evidence does not indicate that Peters and Ellis conspired together and that they may not be convicted for conspiring separately with the corporation, Peters Fabrics, Inc. Defendants essentially argue that a purported conspiracy between an individual and a fictional entity—a corporation—cannot exist.

■ The evidence suggests that Peters and Ellis conspired together, perform-

---

2. Although Ellis's signature, unlike Peters's, does not appear on either mailed document, Ellis was a participant in the fraudulent scheme and, as such, was responsible for the use of the mails in the execution of the scheme. *See United States v. Perkal,* 530 F.2d 604, 606 & n. 4 (4th Cir.), *cert. denied,* 429 U.S. 821, 97 S.Ct. 70, 50 L.Ed.2d 82 (1976); *United States v. Nance,* 502 F.2d 615, 619 (8th Cir.1974) (quoting *Isaacs v. United States,* 301 F.2d 706, 726 (8th Cir.), *cert. denied,* 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962)), *cert. denied,* 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975).

3. Peters testified that the company had approximately 30 employees in 1977. Ellis testified

that the company had approximately 25 employees at that time.

4. Peters testified that he had visited the warehouse six days prior to the fire. Peters's testimony indicates that he had sufficient familiarity with the contents of the warehouse to know on that visit that the storage space was three-quarters full and that the warehouse contained only a portion of the wool flannel needed to fill a certain customer's order. Peters also visited the warehouse soon after the fire had been extinguished. He testified that on this visit he had noticed that many of the goods shipped to the Sleeper Street warehouse were missing.

ing acts—completing bills of lading, signing insurance claim forms and interrogatory answers—that they were authorized to perform and that they performed with an intent to benefit the corporation.[5] *See United States v. Cincotta*, 689 F.2d at 241–42.[6] The actions of two or more agents of a corporation, conspiring together on behalf of the corporation, may lead to conspiracy convictions of the agents (because the corporate veil does not shield them from criminal liability) and of the corporation (because its agents conspired on its behalf). *See United States v. S & Vee Cartage Co.*, 704 F.2d 914, 920 (6th Cir.1983); *United States v. Hartley*, 678 F.2d 961, 970–72 (11th Cir.1982); *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 603 (5th Cir.1981) (dictum).[7] The jury thus properly convicted Peters, Ellis, and Peters Fabrics, Inc., of conspiracy.

## II. *Late Disclosure of Brady Material*

Defendants allege that the holdings of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), and Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure[8] required pretrial disclosure of the grand jury testimony of Edward Fallon, Jr. The district court denied defendants' pretrial motion for disclosure of Fallon's grand jury testimony, stating that defendants had failed to show a "particularized need" under *Dennis* and that the court would not "assume a *Brady* violation".

After four days of trial, at 9:00 a.m. on Monday, April 25, 1983, the government gave defendants the 38-page transcript of Fallon's grand jury testimony. That date was a nontrial day. When the trial resumed on Tuesday, April 26, defendants moved on the basis of the late disclosure either to dismiss the indictments or to exclude trial testimony by Fallon, or alternatively, for a one-week continuance to enable them to prepare for Fallon's cross-examination. After the hearing, the district court denied these motions. Fallon began his direct testimony on the afternoon of Tuesday, April 26, and all three defense attorneys cross-examined Fallon on Wednesday, April 27.

*Brady* held that the suppression of evidence favorable to the accused and requested by him violates due process where the evidence is material to guilt or to punishment. *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196. Fallon's grand jury testimony contained statements arguably consistent with defendants' innocence and other statements inconsistent with a prior sworn statement by Fallon. The latter statements could serve to impeach the credibility of Fallon, the government's most important witness, and therefore qualify as *Brady* material. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

---

**5.** The fire and theft insurance claim forms named the corporation, Peters Fabrics, Inc., as claimant.

**6.** A corporate officer, acting *alone* on behalf of the corporation, could not be convicted of conspiring with the corporation. *See United States v. Carroll*, 144 F.Supp. 939, 941–42 (S.D.N.Y. 1956). But this is not such a case.

**7.** These cases reject the syllogism, at least in the criminal context, that since the acts of corporate officers constitute acts of the corporation, and since a corporation cannot conspire with itself, it cannot conspire with its officers. There is a world of difference between invoking the fiction of corporate personality to *subject* a corporation to civil liability for acts of its agents and invoking it to *shield* a corporation or its agents from criminal liability where its agents acted on its behalf. *See United States v. Hartley*, 678 F.2d at 970.

**8.** Fed.R.Crim.P. 16(a)(1)(A), which provides for discovery of statements of the defendant, states:

"Where the defendant is a corporation, ... the court may grant the defendant, upon its motion, discovery of relevant recorded testimony of any witness before a grand jury who ... (2) was, at the time of the offense, personally involved in the alleged conduct constituting the offense and so situated as an officer or employee as to have been able legally to bind the defendant in respect to that alleged conduct in which he was involved."

This rule entitled defendant Peters Fabrics, Inc., to Fallon's grand jury testimony.

■ Where, as here, defendants have made a specific pretrial request for exculpatory information, *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976), requires reversal only if nondisclosure "might have affected the outcome of the trial". *See United States v. Flaherty*, 668 F.2d 566, 588 (1st Cir.1981) (citation omitted). Since we deal here not with complete nondisclosure but rather with delayed disclosure, we must decide "whether defendant[s] [were] able to use the disclosed material effectively in preparing and presenting [their] case". *Id.* at 588–89; *see United States v. Higgs*, 713 F.2d 39, 44 (3d Cir.1983) ("No denial of due process occurs if *Brady* material is disclosed to [defendants] in time for its effective use at trial"); *United States v. Xheka*, 704 F.2d 974, 981 (7th Cir.1983) (quoting *United States v. McPartlin*, 595 F.2d 1321, 1346 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979)) (late *Brady* disclosure requires reversal if it deprived defendant of fair trial), *cert. denied*, —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983).

■ We hold that the disclosure at trial of the *Brady* material did not prejudice defendants. They had two full days, including one nontrial day, in which to prepare to cross-examine Fallon with regard to his grand jury testimony, which was short, uncomplicated, and fairly predictable. Defendants also had nine days between disclosure and the end of trial. Defendants cannot credibly claim that the government had misled them by failing to disclose Fallon's grand jury testimony. Defendants contend that they had continued to rely on sworn statements made by Fallon during the insurance company's investigation in autumn 1977, at which time Fallon had supported defendants' version of events underlying the insurance claims. However, Fallon had asserted the Fifth Amendment upon receiving a grand jury subpoena in autumn 1980 and had testified before the grand jury in November 1982 under a court order granting him immunity and directing him to testify. Less than three months after Fallon's grand jury testimony, the grand jury indict-

ed the defendants, who, under the circumstances, should have suspected that Fallon had renounced his 1977 testimony in incriminating them. The government removed all doubt as to whether Fallon had changed his story when, in its opening statement, it said that Fallon would testify that no theft had occurred.

The defendants made ample use of Fallon's grand jury testimony in their effective cross-examination of Fallon, whose credibility suffered from his admissions that he had lied in previous sworn statements to the insurance company's counsel and before the grand jury, that he had frequently argued with Peters and Ellis and had once been fired after an argument with Peters, that he had told other persons that he did not like the way they did business, and that he was unsure whether Ellis had been in Boston on the day of the fire. Fallon also admitted that Peters had advised him to "tell the truth" in answering questions about activity at the Sleeper Street warehouse.

Fallon's grand jury testimony contained little exculpatory material, all of which was easily digestible. Given that defendants made full use of such material, they were not prejudiced by the timing of disclosure. *See United States v. Higgs*, 713 F.2d at 44 (no prejudice where *Brady* material—immunity grants to government witnesses—was disclosed in time for use during cross-examination to challenge credibility of witnesses); *United States v. Xheka*, 704 F.2d at 981 (no prejudice where defendant was able to make full use of *Brady* material); *United States v. Allain*, 671 F.2d 248, 255 (7th Cir.1982) (same).

Similar reasoning disposes of defendants' arguments that they were entitled to pretrial disclosure of Fallon's grand jury testimony under the "particularized need" test of *Dennis v. United States* or under Fed. R.Crim.P. 16(a)(1)(A). The government did in fact disclose the material, and the timing of disclosure did not prejudice the defendants.

### III. Court Order Precluding Cross-Examination of Fallon Concerning His Psychiatric History

Defendants challenge the district court's exclusion of cross-examination of Fallon concerning his psychiatric history. After a brief interrogation of Fallon by the court and by government counsel, the court granted the government's motion in limine to prevent inquiry during cross-examination into Fallon's psychiatric history. During the court's questioning, Fallon revealed that he had visited a clinical psychologist, who had treated Fallon for anxiety. Fallon's personal physician had also prescribed Valium, which Fallon had taken "for a short period". The court concluded that neither Fallon's ailment nor the Valium would have affected his ability to make observations or to communicate effectively in previous statements. The court also found that the ailment would not affect Fallon's ability to communicate at trial.

Defendants now claim that the court should have permitted them on cross-examination "to explore facts from which the jury may well have concluded that Fallon's anxiety figured in his decision to change his story, either to alleviate such anxiety by cooperating with [John Dunn, the postal inspector investigating the case] and the government investigation, or to retaliate for the employment situation Fallon perceived as having created [his anxiety]".

Whatever the merit of defendants' theory that they could have discredited Fallon by cross-examining him with regard to his psychiatric history, the defendants failed to make an offer of proof to the district court that the purpose of such cross-examination was to reveal Fallon's motivation to lie. *See, e.g., United States v. Lopez,* 611 F.2d 44, 46 (4th Cir.1979); *United States v. Honneus,* 508 F.2d 566, 572–73 (1st Cir.1974) (court had discretion to preclude cross-examination into specific matters, without offer of proof or other indication where such questions would lead), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). The claimed goal of the cross-examination would not have been obvious to the district court after its questioning of Fallon. Although an offer of proof may be unnecessary to preserve an appeal of a trial court's exclusion of evidence in situations where the substance and materiality of the excluded evidence are obvious, *e.g., United States v. Alden,* 476 F.2d 378, 381 (7th Cir.1973), this case does not present such a situation.

Given the district court's examination of Fallon and defendants' failure to make an offer of proof of the substance and materiality of their planned cross-examination of Fallon concerning his psychiatric history, the district court did not abuse its discretion in cordoning off that area of cross-examination. *See United States v. Lopez,* 611 F.2d at 45–46 (trial court's decision on permissibility of cross-examination regarding psychiatric history reversible only for abuse of discretion); *United States v. Honneus,* 508 F.2d at 573.

*Affirmed.*