UNITED STATES of America, Appellee,

v.

Peter F. INGRALDI,
Defendant, Appellant.

No. 85–1677.

United States Court of Appeals,
First Circuit.

Argued April 9, 1986.

Decided June 16, 1986.

William A. Brown, with whom Brown & Prince, Boston, Mass., was on brief, for defendant, appellant.

Peter A. Mullin, Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Defendant Peter Frank Ingraldi appeals his conviction on two counts of mail fraud in violation of 18 U.S.C. § 1341 and four counts of interstate transportation of stolen property in violation of 18 U.S.C. § 2314. Defendant bases his appeal on three grounds: (a) that he was denied the right to a fair trial because the government failed to make timely disclosure of information indicating that its chief witness was a paid government informant; (b) that the district court should have entered a judgment of acquittal on the mail fraud counts of the indictment after the government's opening statement; and (c) that improper remarks made by the government prosecutor in his closing argument warranted the grant of a new trial. We affirm. The material facts are set out below.

Defendant owned a consumer electronics business in New York, Big H Sound, which was plagued by financial difficulties. The business ceased operations on December 22, 1979, after it was sued by several creditors and from that date on defendant began to broker merchandise on his own, working out of a truck. Sometime in 1977, defendant had developed close business ties with one James Studley (Studley), the owner of Sound Room, Inc., a consumer electronics business in Rockland, Massachusetts. When Big H Sound went out of business, defendant asked Studley to help him get back on his feet and to order some merchandise from Samsung Electronics America (Samsung), an Illinois-based firm, on his behalf. Defendant had made an unsuccessful attempt to order merchandise from Samsung for Big H Sound in the past.

On January 6, 1980, defendant and Studley attended a Consumer Electronics Show together in Las Vegas, Nevada. While there, they entered into an agreement with representatives of Samsung to purchase over one million dollars worth of Samsung merchandise between January and June, 1980. The agreement provided that Sound Room would pay for the Samsung merchandise in two stages, paying a fifty percent down payment each time it placed an order and the balance within thirty days. Defendant posed as a newly hired buyer of Studley's company, Sound Room, and was introduced under the alias Ryan Peterson. Studley told the Samsung representatives that defendant would have the authority to order goods on behalf of Sound Room. According to the evidence elicited at trial, defendant and Studley had first arranged between themselves that defendant would order goods from Samsung in the name of Sound Room and then repurchase them after they were delivered, with a small mark up to Studley.

Defendant subsequently gave three separate orders for Samsung merchandise pursuant to the agreement. On January 16, 1980, he ordered $145,198 worth of goods from Samsung representatives when they came to Sound Room's offices in Rockland, Massachusetts. He gave the representatives a Sound Room check signed by Studley for half that amount, to cover the down

payment. The goods were shipped from Bensonville, Illinois, to Sound Room on January 29, 1980. On February 6, 1980, defendant ordered $168,583 worth of goods. This time he paid the 50% down payment by Sound Room check signed by him under the alias Ryan Peterson. These goods were shipped to Sound Room in two shipments, one from Seattle, Washington, and the other from Bensonville, Illinois, on February 8, 1980. Defendant's third order was for $275,000 worth of goods and was placed on February 13, 1980. Defendant wrote two Sound Room checks for the down payment and signed both of them Ryan Peterson. This last order was never shipped, however, because the Sound Room checks had begun to bounce. The check for the first order's down payment bounced once before it cleared and the check for the second order's down payment never did clear.

The repurchase agreement between the defendant and Studley fell apart in similar circumstances. Defendant wrote Studley seven Big H Sound checks in the month of February for a total of $352,250 in purported payment for the Samsung merchandise. All seven checks bounced. The evidence at trial showed that Big H Sound had a balance of less than $700 in the bank on which those checks were drawn at the time they were written and that no deposits were ever made to cover them. Defendant never made good on any of the checks.

Defendant was interviewed concerning these activities in June, 1980, by F.B.I. Special Agent Clatanoff (Clatanoff). In response to questioning, he admitted that he had accompanied Studley to Las Vegas, that he had helped him negotiate the agreement with Samsung, and that he had used the alias Ryan Peterson in doing so. He said he used the alias in part to avoid having Sound Room connected to Big H Sound with which his name was associated. When Clatanoff presented him with a copy of the Sound Room check he had signed as Ryan Peterson for the second order of Samsung goods, he admitted that he had written it, though he claimed to have done so with Studley's knowledge and approval.

Defendant also admitted that he later exchanged the Samsung merchandise for consumer electronic goods of equal value with a consumer electronics company in New York, and that he then sold the goods obtained in the exchange for cash. He admitted that he had given Studley seven bad checks and had not used the cash subsequently obtained for the goods to repay Studley because he had to pay off some other debts first.

Following this interview, defendant was indicted for interstate transportation of stolen goods and mail fraud. The shipments of the Samsung merchandise formed the basis for the interstate transportation of stolen goods counts, and the mail fraud charges were based on the invoices that accompanied these shipments. At trial, defendant disputed that any of those invoices had ever been mailed. Defendant's position on the other counts was that Studley was the chief perpetrator of the offenses charged, that he was only a minor participant, and that he should not have been indicted when Studley went free.

## I. DELAYED DISCLOSURE OF BRADY MATERIAL

Prior to trial, defendant filed a motion for exculpatory evidence which included a request for disclosure of any money or property paid to witnesses. Defendant also filed motions for the disclosure of (1) any rewards, promises or inducements given to any witnesses, and (2) the identity of any informants providing information relied on by the government to arrest the defendant. The government's consolidated response to these motions stated that there were no informants in the case and that no promises, rewards or inducements had been given to any witness.

One day prior to the scheduled start of trial the defendant served subpoenas on the Small Business Administration (SBA) and the Federal Bureau of Investigation (FBI), ordering them to produce documents relating to Studley at trial. The government had previously identified Studley as a

prospective witness and provided the defendant with copies of reports of two interviews with Studley, the transcript of his testimony in a related civil case and the results of a criminal-records check. The government moved to have these subpoenas quashed or modified and the court agreed to inspect the material the government deemed answerable to the subpoenas *in camera.*

After inspecting this material, the court ordered the government to produce a number of files. The files material to this appeal are: an FBI file relating to a 1973 investigation of alleged fraud involving Studley's personal bankruptcy; an FBI file relating to a 1979 investigation of alleged bankruptcy fraud involving House of Radios, a business once owned by Studley's wife and managed by Studley; and an FBI confidential informant file relating to Studley.

The first of these files was opened after the trustee in bankruptcy alleged various false statements by Studley when he filed for personal bankruptcy on January 26, 1973. The investigation did not result in prosecution. The bankruptcy fraud investigation described in the second file was also closed without prosecution because the business had been sold to a third party and remained in operation for a period of time before bankruptcy was declared. The confidential informant file indicated that an informant with the code name "Sparks," identified at trial as Studley, had provided information to Clatanoff on July 19, 1979, about the theft of stereo receivers from Bose Corporation in Framingham, Massachusetts. The file showed that Studley was then designated by Clatanoff as a confidential informant and that he met with Clatanoff on five other occasions between July 19 and December 12, 1979. On those occasions he provided further information on the Bose receivers as well as information about the hijacking of some Whistler radar detectors and the plans of two individuals to perpetrate a bankruptcy "bust-

out" scheme.[1] The file also showed that Studley recovered six of the stolen Bose receivers on December 12, and received $300 from Clatanoff on December 12, for services rendered from July 19 to December 6, 1979.

It was five days into the trial when these files were turned over to the defendant. Defendant promptly moved to dismiss the indictment for failure of the government to produce this information prior to trial. Defendant now appeals the denial of that motion. He maintains that the delayed disclosure of this material prejudiced him in two ways: that it prevented him from making an informed decision as to whether to make an opening statement, and deprived him of the opportunity to effectively cross-examine Studley.

In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), the Supreme Court held that the suppression of evidence favorable to the accused and requested by him violates due process where the evidence is material to guilt or punishment. The government concedes that the information contained in the files at issue here could have been exculpatory as it related to Studley's cross-examination. Impeachment evidence has long been recognized as *Brady* material. *See United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 3380–81, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Where, as here, defendant has made a specific pretrial request for exculpatory information, reversal is required if nondisclosure "might have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976); *United States v. Drougas,* 748 F.2d 8, 23 (1st Cir.1984); *United States v. Peters,* 732 F.2d 1004, 1009 (1st Cir.1984). When the issue is one of delayed disclosure rather than of nondisclosure, however, the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and

---

**1.** The term "bust-out" was defined at trial as a business set up to defraud creditors or one which later becomes a scheme to defraud creditors.

presenting the defendant's case. *United States v. Drougas,* 748 F.2d at 23; *United States v. Peters,* 732 F.2d at 1009.

■ We find the first of defendant's claims unpersuasive. There is nothing in the FBI or SBA files that would help defense counsel decide whether or not to make an opening statement. Defendant already knew that Studley was going to be the government's chief witness and there is no indication in the files, for example, that a defense of entrapment might have been open to defendant. Moreover, nothing in the government files rebuts the defendant's own damning admissions that he wrote the dud checks in favor of Studley, that he sold the goods thereby obtained, and that he had no funds to make good on those dud checks. In sum, we believe that the only possible value of the government files lay in their impeachment potential.

■ The effect of the delayed disclosure on defense counsel's cross-examination of Studley depends on the extent the defendant actually managed to use the information in the files despite the delay. The record shows that defense counsel conducted an extremely effective cross-examination of Studley, that he did succeed in using the tardily disclosed information to impugn Studley's credibility, and that there were so many other grounds for attacking Studley's credibility, which defense counsel exploited fully, that the information in the files was of minimal impact.

Defense counsel began by having Studley outline his shady employment history back to 1969. Studley had been associated with at least seven different companies from 1969 to 1982. Three of those companies had major thefts of goods in the time Studley was associated with them, one ceased to do business after a fire destroyed all its goods, one, House of Radios, had been a "bust-out," and Sound Room ended in involuntary bankruptcy. Defense counsel also implied that Studley was testifying against defendant to vindicate a personal grudge by bringing out that Studley had lived from the fall 1979 to the spring 1980 with a woman named Joy Crawley who then left him and married defendant.

Studley was then questioned on the specific incidents noted in the government files. Defense counsel questioned him at length about his status as a government informant, the times and dates he met with Clatanoff, whether he used the code name "Sparks," and whether he had received the $300 payment from Clatanoff. He was also asked to recount the substance of the information he had imparted to Clatanoff. Studley repeatedly denied that he had ever been a government informant, though he admitted giving Clatanoff the information about the Bose receivers. He also admitted receiving the $300 but said it was given him to cover the cost of recovering the Bose receivers and not as a payment for information. He denied giving any information about the hijacking of Whistler radar detectors though he admitted that Clatanoff had asked him about them. Clatanoff was also cross-examined extensively about Studley's informant status. Clatanoff testified that Studley had been designated an informant from July 23, 1979, to March 17, 1980, and that he had been closed out on that date because it was suspected he was involved in a fraud.

Studley's involvement in the House of Radios fraud took up a good deal of the cross-examination. It was established that Studley had been both manager and sole purchasing agent of the business, and that he had frequently referred to himself as owner of it even though it was held in his wife's name. Defense counsel also leaned heavily on the fact that Studley had been investigated for fraud in connection with his filing for personal bankruptcy, to raise doubts about Studley's credibility. After eliciting the information that the petition was discharged, defense counsel proceeded to question Studley on each statement he made on his bankruptcy petition. In doing so, defense counsel pointed out several glaring inconsistencies between the sources and amount of income Studley declared in his petition and his later testimony as to the amount and sources of his income in

bankruptcy court when the petition came up for hearing.

The detailed and thorough cross-examination of both Studley and Clatanoff on the substance of the information recorded in the government files dispels any trace of prejudice from the delayed disclosure of those files. We fail to see what more defendant could have done with the information. Moreover, his failure to move for a continuance when he received the files indicates that he was himself satisfied that he had sufficient time to use them to his best advantage.

█ We note that there is no evidence here that the government deliberately concealed Studley's informant status. The government has stated in its brief that the information only became known to it on either July 8 or 9. It was then decided to submit the matter to the trial judge *in camera.* Before the decision was implemented, however, defendant served the subpoena on the FBI and SBA. The issue was then presented to the trial judge through the government's motion to quash the subpoenas. It was sloppy practice on the part of the prosecutor not to have discovered that the chief government witness had once been designated a government informant. We do not believe, however, that the error reached such a level of prosecutorial misconduct as to warrant a new trial.

## II. THE DENIAL OF DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL ON THE MAIL FRAUD COUNTS AFTER THE GOVERNMENT'S OPENING

Defendant contends that it was error for the trial court to refuse to enter a judgment for acquittal on the mail fraud counts in response to defendant's motion, made after the government's opening statement, because the government failed to state any evidence it would offer to substantiate those counts. Defendant also moved for judgment of acquittal at the close of the evidence, but has appealed only the denial of the motion made after the opening.

Motions for judgment of acquittal are governed by Federal Rule of Criminal Procedure 29(a) which provides in pertinent part that:

[t]he court on motion of a defendant or of its own motion shall order the entry of acquittal of one or more offenses charged in the indictment or information *after the evidence on either side is closed* if the evidence is insufficient to sustain a conviction of such offense or offenses. [Emphasis added.]

Although the wording of the rule indicates that a motion for judgment of acquittal may only be brought after the close of either side's evidence, this court has held that the motion can be brought after the government's opening statement in certain limited circumstances. This extension of the rule began with this court's decision in *In Re United States,* 286 F.2d 556 (1st Cir.1961), *rev'd sub nom. Fong Foo v. United States,* 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962). The issue in that case was whether the trial judge could enter a judgment of acquittal during the presentation of the government's case long before the government had an opportunity to show whether it had a case. We held that the district judge "had no power, that is to say, jurisdiction" to enter a judgment of acquittal. We issued a mandamus requiring the judge to vacate his erroneous suspension order, *id.* at 563, and held that since the trial judge was without jurisdiction to enter the judgment of acquittal, double jeopardy would not attach. *Id.* at 565. We left open the question whether

judgment of acquittal might properly be entered in some situations even before the close of the Government's case, as, for instance, when the Government's opening statement unmistakably shows that the evidence it proposes to introduce would not sustain a conviction, or when it produces evidence conclusively showing either that it has no case or that the accused has an iron-clad defense.

*Id.* at 562.

The Supreme Court reversed on the ground that the verdict of acquittal was

final and could not be reviewed without violating defendant's constitutional right against double jeopardy. 369 U.S. at 143, 82 S.Ct. at 672. The question left open in *In Re United States,* whether the trial court could enter a judgment of acquittal after the government's opening in certain circumstances, was not addressed by the Supreme Court.

It was answered for this circuit in *United States v. Capocci,* 433 F.2d 155, 158 (1st Cir.1970). We there held that in certain circumstances a judgment of acquittal could be entered after the government's opening, citing *United States v. Dietrich,* 126 F. 676 (C.C.D.Neb.1904). *Dietrich* held that a judgment of acquittal could be entered after the government's opening where a fact is clearly and deliberately admitted in the government's opening which must defeat the prosecution in the end. 126 F. at 677–78. We emphasized in *Capocci* that the granting of such a motion is "purely discretionary." 433 F.2d at 158. *Capocci* has since been followed in *United States v. Oliver,* 570 F.2d 397, 400 (1st Cir.1978), in which we held that the judgment of acquittal was purely discretionary, and that a judgment of acquittal should be granted after the government's opening only when the statement clearly and affirmatively shows that the charge against the defendant cannot be sustained under any view of the evidence consistent with the statement.

■ Recognizing that the trial court has the discretion to enter a judgment of acquittal after the government's opening raises a further question, whether the appellate court should review the denial of such a motion. Under *Fong Foo,* 369 U.S. 141, 82 S.Ct. 671, the government cannot appeal the grant of the motion. In both *Capocci* and *Oliver,* we reviewed, without stating any rationale for doing so, the government's opening statement to determine if the district court had abused its

discretion in denying the motion for acquittal. We do not, therefore, consider *Capocci* and *Oliver* hard precedent making such review mandatory. We believe, for the following reasons, that the denial of such a motion should not be reviewable.[2] First, the defendant's right to appeal on the ground that the evidence was insufficient to convict adequately covers the situation. By the time the court of appeals comes to review the denial of the motion for acquittal, a trial will already have taken place and the evidence introduced by the government will be in the record. A court would surely not grant an acquittal on the basis of a barren opening statement if the evidence itself proved fertile ground for conviction. Second, absent an order by the court, a defendant has no right to have the government outline in detail in its opening all the evidence it intends to introduce. An opening statement is not evidence and it is usually left to the prosecutor to decide how elaborate it will be. Indeed, there is no obligation on the part of the government to make an opening statement at all under the Federal Rules of Criminal Procedure.[3] Allowing the trial court to enter a judgment of acquittal after the government's opening was not intended to change the role of the government's opening. It was intended as a way of incorporating a principle of judicial economy, long recognized in civil law, into the criminal context. *See* concurring opinion of Judge Aldrich in *In Re United States,* 286 F.2d at 565, quoting *United States v. Dietrich,* 126 F. at 678, to the effect that it would be a waste of judicial time to listen to evidence when it is obvious that a fact clearly and deliberately admitted in the opening must defeat the prosecution. We accordingly find no merit in appellant's objection to the district court's refusal to have entered a judgment of acquittal after the government's opening. Not only did the court act well within the

---

2. The government's opening here was sparse in its description of how it planned to show mail fraud. It did not, however, contain anything to affirmatively show that its charges of mail fraud could not be sustained.

3. The Rules do not mention or advert to an opening statement.

bounds of reasonable discretion, its action is not now reviewable.

## III. THE DENIAL OF DEFENDANT'S MOTION FOR A MISTRIAL

Defendant claims that there are two separate reasons why he should have been granted a mistrial. First, he claims that he was prejudiced because the court commenced trial before the documents he had subpoenaed from the government had arrived. He contends that he needed the documents in order to determine whether he should make an opening statement. Second, he claims that the prosecutor made several improper remarks in closing which warranted the grant of a mistrial.

■ As indicated implicitly in our discussion of the *Brady* claim, the first reason advanced for a mistrial is a bogus claim. True, the government can be faulted for not having the subpoenaed documents ready the first day of trial as requested, and the court might have waited until they did arrive. But this was not ground for ordering a mistrial. These documents were cross-examination material and they were produced in time for the defendant to use them in cross-examination. If he had wanted them before that he should have served his subpoena earlier (the government claimed that the delay ensued because the documents had to be collected from several different locations), or moved to have the subpoenas returnable before trial pursuant to the procedures laid down in Federal Rule of Criminal Procedure 17(c).

The second ground advanced by defendant as warranting a mistrial has somewhat more weight. In the course of his closing, the prosecutor stated:

The indictment reads that the defendant and others known and unknown devised and intended to devise a scheme and artifice to defraud.

Based on the evidence that you've heard in this courtroom, I think you would certainly be justified in concluding that Mr. Studley was one of those others....

We certainly do not condone Mr. Studley's actions either in this case or in any prior proceedings or matters that have been testified to here. He's no choir boy. That's for sure.

*I wish that I could go into why he is not indicted.* [Emphasis added.]

At that point defense counsel objected. The court sustained the objection and admonished the prosecutor that "[t]he only issue in this case is whether this defendant, Mr. Ingraldi, has been proven guilty beyond a reasonable doubt. Nothing else counts." The prosecutor proceeded:

As the judge has just told you and as she will tell you in her final charge, you are being asked to decide, based on the law and the evidence that you've heard in this courtroom, whether or not Peter Ingraldi is guilty of the offenses charged in this indictment. *And she is going to tell you that you must do that without regard to the guilt or innocence of anyone else.*

*It would certainly be a miscarriage of justice, and it would be wrong, for you to vote to acquit Mr. Ingraldi....* [Emphasis added.]

At that point, defense counsel interrupted him with a further objection. The court again sustained the objection, instructing the prosecutor to "lay off that part of the case" (*i.e.* the effect of Studley's involvement on defendant's guilt) and stating again that the question was "not what anybody else did, not anybody else's guilt, ... [but] simply and solely [whether] the government prove[d] Mr. Ingraldi guilty beyond a reasonable doubt."

Following a recess after the closing arguments defendant moved for a mistrial on the basis of the prejudicial comments in the prosecutor's closing. He now appeals the denial of that motion. The government concedes that the prosecutor's comments were "clumsy and inartful," that the comment about the reasons Studley was not indicted impermissibly referred to facts outside the record, and that the statement that it would be "a miscarriage of justice to acquit ..." was also improper. It claims,

however, that the comments were harmless error in the circumstances.

■ This court takes a dim view of this kind of prosecutorial misconduct. As we said in *United States v. Capone*, 683 F.2d 582 (1st Cir.1982):

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all.... It is as much his duty to refrain from improper methods calculated to produce a conviction as it is to use every legitimate means to bring about a just one."

*Id.* at 585 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)). The issue here, however, is whether it is necessary to retry the case. In deciding whether a new trial is required—either because prosecutorial misconduct likely affected the trial's outcome or to deter such misconduct in the future—we consider the severity of the misconduct, whether it was deliberate or accidental, the context in which it occurred, the likely curative effect of the judge's admonitions and the strength of the evidence against the defendant. *See United States v. Cox*, 752 F.2d 741, 745 (1st Cir.1985); *United States v. Capone*, 683 F.2d at 586.

After examining the record with these factors in mind, we conclude that a new trial is not warranted. We recognize that the prosecutor's remarks were seriously inappropriate and that they may also have been deliberate. These factors are outweighed, however, by others.

We are impressed by the fact that the impropriety of the prosecutor's remarks was promptly addressed, and by the clarity of the instructions given the jury to discount them. We may assume that the court's twice-repeated admonition to the prosecutor, that the issue was not what anybody other than the defendant did, was not lost on the jury. Further, in her final instructions to the jury, the trial judge emphasized that the facts had to be established solely on the evidence and that the closing arguments of counsel were not evidence.

It is unlikely that any prejudice that survived these instructions could have affected the outcome of the trial. The most the remarks about Studley's nonindictment could have achieved was to rebut the inference that Studley was not to be believed because he was testifying pursuant to a deal with the government that he himself would not be prosecuted. Given the numerous other reasons brought out at trial for not believing Studley, the mere possibility that one of them was rebutted was not sufficient to warrant granting a new trial.

■ We are likewise unconvinced that the remark, that it would be a miscarriage of justice to acquit the defendant, affected the outcome of this trial. The evidence against the defendant was substantial. It included his own admissions made in the interview with Clatanoff, bank documents showing no funds and no deposits to cover the checks defendant gave Studley, and corroborating testimony from the Samsung representatives who dealt with defendant in Las Vegas, and of an employee of Sound Room who testified that defendant had hired him to drive the Samsung merchandise to New York, where defendant, after an exchange, turned it into cash. In sum, the record reveals that the jury's verdict was unlikely to have been the result of outrage inspired by the prosecutor's remarks, and that it was "based upon lengthy testimony, vigorous argument and a reasonable belief" that defendant was guilty. *United States v. Capone*, 683 F.2d at 587.

*Affirmed.*