# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 22, 2000 Session

## STATE OF TENNESSEE v. ERNEST B. EADY

### Appeal from the Criminal Court for Knox County
### No. 67084    Richard Baumgartner, Judge

---

### No. E2000-00722-CCA-R3-CD
### February 13, 2001

---

The defendant appeals from his conviction for second degree murder, contesting the sufficiency of the evidence, the timeliness of the state's disclosure of a potentially exculpatory witness, and the trial court's failure to declare a mistrial. We affirm the judgment of the trial court.

### Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Keith E. Haas, Sevierville, Tennessee, for the appellant, Ernest B. Eady.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Ernest B. Eady, appeals as of right from his conviction by a Knox County Criminal Court jury for second degree murder, a Class A felony. The defendant was sentenced to twenty years incarceration. The defendant argues that (1) the evidence is insufficient to support his conviction because the state failed to establish the identity of the perpetrator and the required mental state of knowing, (2) the state improperly failed to disclose the name of a potentially exculpatory witness until the morning of the original trial date, and (3) the trial court erred by not declaring a mistrial when a juror informed the court that members of the victim's family communicated with him during a recess.

The case arises from the shooting death of Robert Lee Fletcher, Jr. At trial, James Canon testified as follows: He was known as "Chicken" and owned Mr. C's Private Party Lodge Number One. On November 21, 1998, he was working at the lodge, and his son, Mark Canon, was working as the doorman. About thirty-five or forty people were in the lodge that night. Around 2:30 a.m.,

he was patrolling the parking lot, which was "pretty full" of cars, when he saw four men, who had parked in the back of the parking lot, approaching the lodge. He identified one of the men as the defendant, whom he knew as "Rabbit." He told the defendant that one of the defendant's friends was too intoxicated to go inside the lodge, and the defendant and the other two men persuaded their friend not to go inside. The defendant fell down as he approached the step to the lodge's entrance. Mark searched the defendant for weapons, which was the lodge's normal practice, and then allowed the defendant to enter.

James Canon testified that around 3:30 a.m., the defendant poured his drink onto the floor, something the defendant had done before and had led to Mr. Canon asking him to leave. When Mr. Canon asked the defendant to leave this time, the defendant "started" at him but was held by his friends. As the defendant was escorted outside, he knocked over some tables and chairs and said, "I am going to get you" and "I am tired of you fu**ing with me." He followed the defendant outside to make sure the defendant left. Around 4:45 a.m., when he was inside the lodge, his son called to him, "It's Rabbit. He has got a gun." His son had the door partially opened and was talking to the defendant, who was outside. He told his son to close the door, and between two and five minutes later, he heard someone say, "He is shooting." Then he heard someone say, "He has been shot." He telephoned 911, and the police arrived in six to seven minutes. He told them that a person he knew as Rabbit shot into the lodge. He later identified the defendant from a photographic lineup. Also, he identified photographs of the outside of the lodge, and these photographs were admitted into evidence.

Mark Canon testified as follows: On November 21, 1998, he was working as the doorman at the lodge. The front of the lodge was brick with two steel doors and two windows covered with wood. He searched everybody that came into the lodge for weapons, and the defendant did not have any weapons when he went inside the lodge. The defendant, whom he knew as Rabbit, had patronized the lodge several times before. Around 3:30 a.m., a friend of the defendant's, whom he knew as T.C., was escorting the defendant out of the lodge, and the defendant was pushing chairs as he left. When the defendant left, there were about thirty-five or forty people in the lodge.

Mark Canon testified that sometime later, the defendant returned to the lodge and knocked on the door. At that time, about thirty to forty people were in the lodge and the parking lot was full of cars. James Canon asked Mark Canon who was at the door, and Mark responded that it was the defendant. James Canon then instructed him not to let the defendant inside. He did not open the door until a patron wanted to leave, at which point he noticed that the defendant had what looked like a .9 millimeter gun. He told the defendant that he could not come inside. He was holding the door, which was open about one foot, and the defendant was looking inside, saying "Where is he at?" He told the defendant to put the gun away, but the defendant kept asking, "Where is he at?" While he was talking to the defendant, the disc jockey left through the door. He then tried to close the door, but the defendant pulled the outer doorknob, preventing him from closing it. The defendant then stepped back and cocked the gun, which enabled him to close and lock the door. After he told his father that the defendant was outside with a gun, a wood chip from the lodge's sign, which was a

board that covered a window opening in the front of the building, hit his shoulder. He then heard someone say that somebody had been shot.

Mark Canon admitted that he could see only shapes and colors with his right eye but that he could see clearly with his left eye as long as he was wearing his contact lens. He stated that he was wearing his contact lens that night and that he saw the defendant outside the lodge with a gun. He also said that he did not go outside after the shots were fired but that several patrons did leave the building.

Investigator Ken Slagle of the Knoxville Police Department testified as follows: On November 21, 1998, he was dispatched to Mr. C's Private Party Lodge and arrived at 5:20 a.m. There were about fifteen to twenty people inside, and he saw the ambulance personnel working on a person in the rear of the lodge. Based upon conversations with James and Mark Canon, he and another officer went to the defendant's apartment. The defendant told him that he had been inside the apartment since 10:00 or 10:30 the night before. The defendant agreed to be interviewed at the police station, where Investigator Slagle advised him of his rights and the defendant signed a waiver. He asked the defendant about the murder at the lodge, and the defendant said that he knew the victim but that he had not left his apartment since 10:00 the night before and did not know anything about the murder.

Investigator Slagle stated that he presented photographic lineups to James and Mark Canon separately and that both identified the defendant. He also acknowledged that searches of the apartment and the defendant's car did not produce a gun, ammunition, or shell casings. He said that the bullet recovered from the victim's body was not tested because a gun was never recovered. The only shell casing found at the scene was in the street in front of the lodge.

Officer Mark Waggoner, a criminalistics expert with the Knoxville Police Department, testified as follows: On November 21, 1998, he was dispatched to the crime scene to collect evidence. Two holes in the front of the lodge appeared to have been caused by bullets. It appeared that one bullet struck the brick, while another went through the lodge's wooden sign, which was particle board covering a window on the front of the building. Officers found a single, .9 millimeter shell casing in the street in front of the lodge. This location was consistent with a line of travel through the sign to the victim's body in the rear of the lodge. The distance from the shell casing to the bullet hole in the window was sixty-three feet, eight inches, and the distance from the window to the victim's body was thirty-three feet, one inch. He estimated that the length of the lodge was forty feet. He photographed the inside and outside of the lodge, and these photographs were admitted into evidence. One photograph of the inside showed eight people present, and he stated that the lodge would have been crowded if thirty-five to forty people were inside.

On cross-examination, Officer Waggoner testified that although a spent bullet could be tested to determine its caliber, Investigator Slagle did not ask him to test the bullet recovered from the victim's body. Also, he was not asked to fingerprint the shell casing or to test for traces of gunpowder residue. However, he said that it was highly improbable the shell casing would have

contained fingerprints and that no reliable tests for determining the presence of gunpowder residue existed.

Knox County Medical Examiner Dr. Sandra Elkins performed the autopsy on the victim's body. She stated that the cause of death was a single gunshot wound to the chest, which perforated the trunk of the pulmonary artery and the left lung.

Alicia Fletcher, the victim's sister, testified as follows: On November 21, 1998, she went to Mr. C's Party Lodge just after midnight. The defendant, who was a family friend, was not there when she arrived but came into the lodge later. At some point in time, the defendant was asked to leave the lodge, and he threw a chair as he was being escorted out by one of her cousins, T.C. About forty-five minutes to one hour later, she was sitting at the table next to the door, and she saw the defendant outside the lodge. The defendant was not allowed to enter, and she saw the defendant try to pull open the door, which was being held by Mark Canon. She saw the defendant's face but could not see below his chest. She could not see if the defendant had anything in his hands. She did not recall anyone leaving the lodge while the defendant was outside the door but knew that the disc jockey had already left. After Mark closed the door, he told his father not to let anybody leave because "he has got a gun," and, within seconds, two gunshots were fired. She ran toward the back of the lodge and heard someone shouting that a person had been shot. She then noticed that her brother was on the floor and bleeding.

Ms. Fletcher said that she saw the defendant in September or October 1999 at J.T.'s Pool Hall and that he told her that he was not admitting anything and that he had gone home that night after he left the lodge. She said she responded that she wished he had gone home and never returned to the lodge because things would have been a whole lot different. She then told the defendant how she felt when she saw her brother lying on the floor, and the defendant told her that when his mother had asked him if he had done it, he told his mother, "Mom, if I did it, God rest my soul." As she continued to talk, the defendant knelt and started crying.

Marlon Fletcher, the victim's cousin, testified as follows: On November 21, 1998, he arrived at the lodge between 3:00 and 3:30 a.m. He knew the defendant, saw him on a regular basis, and saw him that night at the lodge. Between 4:00 and 4:30 a.m., he saw the defendant arguing with the doorman. About five or ten minutes later, the defendant returned and was waving a gun that looked like a chrome .380 or .9 millimeter. The doorman pushed the defendant out of the doorway and closed and locked the door. About thirty or forty seconds later, he heard three or four gunshots. He then heard his cousin, Alicia Fletcher, shouting, and he saw the victim on the floor. Between one and two minutes later, he ran outside and saw the defendant's beige, 1998 Buick leaving. He recognized the car because he remembered the defendant buying it a couple of months before this incident and because he had ridden in it on one occasion. He did not know if the defendant was driving.

Marlon Fletcher testified that he saw the defendant several times after the shooting. On one occasion, the defendant told him, "I didn't mean to do that to your cousin. I love you-all like a

family." On cross-examination, he admitted that he had a conviction involving cocaine, that he was on probation on November 21, 1998, and that one of the terms of his probation was to avoid establishments that serve alcohol.

Cathey Siler was at the lodge on November 21, 1998, and testified as follows: She arrived at the lodge around 2:00 a.m. She did not see the defendant inside, but the lodge was crowded. Around 4:00 or 4:30 a.m., she left the lodge and went to her car. Her car was backed into a parking space across the street from the lodge such that when she sat in her car, she could see the front of the lodge through her windshield. Her car was about fifty feet from the lodge's door. As she was starting her car, she noticed a black male wearing a black jacket walking in front of the lodge. Two cars drove up, and then the man in front of the door started shooting at the door. As he was shooting, he was walking backwards toward the street. A car drove up, and the man fired one last shot and then got into the car. She thought that the man fired a total of about four shots.

Connie Tate, the sister of the defendant's girlfriend, testified that she had been to Mr. C's Private Party Lodge and that she knew the owner as Chicken. She stated that about one week after the shooting, she saw the owner of the lodge and Cathey Siler at B & J's Lounge. She said that she heard the owner offer Ms. Siler money in exchange for her testifying. She stated that she never told the police or the defendant what she heard but that she did tell her sister.

Roberta Stevens testified that she was working as a barmaid at the lodge on November 21, 1998. She stated that around 5:00 a.m., she was standing next to the victim when he was shot. She said that at that time, thirty to forty people were in the lodge, which she considered fairly crowded. She testified that she needed medical treatment after the shooting because she had angina and the events surrounding the shooting caused her blood pressure to rise. She stated that while she was at the hospital, Investigator Slagle talked to her. She said that she did not remember telling him anything regarding the location from which she thought the bullets may have been fired.

Investigator Ken Slagle was recalled and testified that he had spoken with Roberta Stevens at the hospital and that Ms. Stevens asked him whether the bullet came from inside or outside the lodge. He stated that Ms. Stevens did not know where the gun was fired. He admitted that he did not reveal this information to the prosecutor until one week before trial and that the prosecutor relayed the information to defense counsel on the morning of the original trial date.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his second degree murder conviction. He argues that the state failed to establish the identity of the perpetrator. He also argues that the evidence does not establish the required mental state of knowing, but rather at best shows recklessness. The state asserts that the evidence is sufficient. We agree.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A conviction for second degree murder requires proof that the defendant knowingly killed another. Tenn.Code Ann. § 39-13-210(a)(1).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn.Code Ann. § 39-11-302(b).

The evidence viewed in the light most favorable to the state reveals that the defendant was asked to leave the lodge after pouring a drink onto the floor. The defendant was uncooperative and threatened James Canon. The defendant left the lodge but returned later with a gun. Mark Canon, Alicia Fletcher, and Marlon Fletcher said that they saw the defendant outside the lodge. Further, Mark Canon and Marlon Fletcher saw that the defendant had a gun, and the gun looked like a .9 millimeter. Additionally, Cathey Siler stated that she saw a black male shoot several shots into the front of the lodge, including one shot from the street before he got into a car. Alicia Fletcher said that the shots were fired within seconds after Mark Canon closed and locked the lodge's door. A hole caused by a bullet was found in the wooden sign that covered a window on the front of the building. The path of travel from the victim's body to the hole was consistent with the location in the street where a .9 millimeter shell casing was found. Also, Marlon Fletcher said that he saw the defendant's car leaving the scene about one to two minutes after the shots were fired. Finally, the proof showed that the defendant said to Marlon Fletcher, "I didn't mean to do that to your cousin." From this evidence, a rational jury could have found beyond a reasonable doubt that the defendant shot the victim.

The evidence further reveals that the defendant had patronized the lodge several times before this incident. The front of the lodge was brick with two steel doors and two windows which were covered by particle board. Officer Waggoner said that the distance from the bullet hole in the window to the victim's body was thirty-three feet, eight inches and that the length of the lodge was about forty feet. Photographs of the inside and outside of the lodge were introduced into evidence and viewed by the jury. When the defendant first arrived at the lodge, the parking lot was almost full of cars, and there were about thirty-five to forty people inside the lodge. When the defendant returned with the gun, the parking lot was full of cars. Roberta Stevens testified that the lodge was fairly crowded that night, and Cathey Siler said that the lodge was crowded. Also, Officer Waggoner

photographed the inside of the lodge when eight people were present, and he said that the lodge would have been crowded if thirty-five to forty people were inside. This photograph was introduced into evidence. From this evidence, the jury could have reasonably inferred that the defendant was aware that the windows were covered by particle board and that the lodge was crowded. A rational jury could have found beyond a reasonable doubt that the defendant was aware that his conduct was reasonably certain to cause death. The evidence is sufficient to support the defendant's second degree murder conviction.

## II. DISCLOSURE OF EXCULPATORY MATERIAL

The defendant contends that the state failed to disclose exculpatory material in a timely fashion. On the morning of the original trial date, the defendant moved for a continuance because the state had just informed him of a witness who was unsure whether the gunshots were fired from inside or outside the lodge. The trial court granted a twenty-four-hour continuance and directed the state to help locate the witness. The next morning, the defendant said that he had spoken to the witness, Roberta Stevens, and that he had subpoenaed her. The defendant then stated that he was ready to begin the trial.

In Brady v. United States, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, the United States Supreme Court stated that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." To establish a Brady violation, the defendant must show by a preponderance of the evidence that (1) he requested the information (unless the information is obviously exculpatory, in which case the state is bound to disclose the information whether requested or not), (2) the state suppressed the information, (3) the information was favorable to the defendant, and (4) the information was material. State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). However, a delayed disclosure of information requires a different analysis than a complete nondisclosure. "[D]elayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993) (citing United States v. Ingraldi, 793 F.2d 408 (1st Cir. 1986)); see State v. Joan Elizabeth Hall, No. 01C01-9710-CC-00503, Lincoln County, slip op. at 19 (Tenn. Crim. App. Jan. 28, 1999), app. denied (Tenn. July 12, 1999) ("[I]f there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, Brady normally does not apply, unless the delay itself causes prejudice.").

In this case, the identity of the person with the potentially exculpatory information was disclosed. The trial court granted a continuance, and Ms. Stevens was located. The defendant talked to her before the trial began and even called her as a witness during the trial. Ms. Stevens testified that she only inquired about the location where the gunshots were fired. She stated that she did not know if the shots were fired from inside or outside the lodge. The defendant was not prejudiced by the delay in receiving this information. Moreover, this evidence was not material. See Edgin, 902 S.W.2d at 390-91 (stating that evidence is considered material if there is a reasonable probability that had it been disclosed earlier, the result of the proceeding would have been different). There is not

a reasonable probability that an earlier disclosure of this information, which the jury heard, would have produced a different result.

### III. IMPROPER COMMUNICATION WITH A JUROR

The defendant contends that improper contact was made with one of the jurors by members of the victim's family. He argues that the trial court should have immediately declared a mistrial. The state argues that the defendant waived this issue by not moving for a mistrial. We agree.

Before the second day of trial began, a juror told the trial court that while he was in the elevator, two people, whom he had seen in the courtroom, said, "He is guilty." The juror said that when he looked at them, they smiled, which he understood as a communication. One of the persons who made these comments was identified as a cousin of the victim. The court brought the juror into open court and allowed the state and defense counsel to question him. The juror stated that the incident had not affected his ability to be fair and to decide the case based upon the evidence. After the questioning, the court asked if either side wanted to strike the juror. Defense counsel responded,

> Your Honor, I have discussed this with my client, Mr. Eady, and he and I both agree that, with the juror showing his honesty and coming forward with what he told us, if he was going to be influenced at all, he wouldn't have told us. So I feel like we can trust and keep him on the panel.

If a motion for mistrial is not made contemporaneously, then the issue is waived absent plain error. See T.R.A.P. 36(a); State v. Robinson, 971 S.W.2d 30, 42-43 (Tenn. Crim. App. 1997). In this case, the defendant not only failed to move for a mistrial, but he affirmatively stated that he wished to keep the juror on the panel. The defendant has waived this issue. Moreover, failure to declare a mistrial under these circumstances does not constitute plain error. See Tenn. R. Crim. P. 52(b).

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE